[This decision has been published in *Ohio Official Reports* at 97 Ohio St.3d 1.]

THE STATE OF OHIO, APPELLEE, v. FRANKLIN, APPELLANT.

[Cite as *State v. Franklin*, 2002-Ohio-5304.]

*Criminal law—Aggravated murder—Death penalty upheld.*

(No. 1998-2061—Submitted May 21, 2002—Decided October 16, 2002.)

APPEAL from the Court of Common Pleas of Montgomery County, No. 97-CR-1139.

_____

**FRANCIS E. SWEENEY, SR., J.**

{¶1} Appellant, Antonio Sanchez Franklin, appeals from his convictions and accompanying death sentences for the aggravated murders of Ophelia Franklin, Ivory Franklin, Sr., and Anthony Franklin.

I.  FACTS

*A.  Causes of Deaths*

{¶2} At 1:53 a.m. on April 18, 1997, the Dayton Fire Department was dispatched to a fire at 39 Riegel Street, where appellant lived with his grandmother, Ophelia Franklin, his grandfather, Ivory Franklin, Sr., and his uncle, Anthony Franklin.  Upon entering the house, firefighters found three bodies.  Ophelia Franklin was found lying on the floor with blood on her head.  A bloody baseball bat lay next to her.  The body of Ivory Franklin was found upstairs.  When firefighters carried his body outside, their gear was covered with blood.  Once the fire was under control, firefighters then observed the charred body of Anthony Franklin in the center room of the first floor.

{¶3} An autopsy revealed that Ophelia Franklin had sustained a gunshot wound to her forehead and a bullet track through her brain.  Forensic pathologist Dr. David Smith observed at least eight blunt force injuries to her head, consistent

with the use of a baseball bat. He concluded that either the gunshot wound or the blunt force injuries would have killed her.

**{¶4}** Dr. Smith further found that Ivory Franklin had been subjected to at least five hard blows to the back of the head, which fractured his skull. However, the examination suggested that the weapon used to cause these injuries was something other than a baseball bat. Anthony Franklin also sustained multiple fractures to his skull, which were consistent with the use of a baseball bat. Dr. Smith concluded that both Ivory Franklin and Anthony Franklin died of "blunt impact injuries of the head and inhalation of products of combustion."

### B. Arrest

**{¶5}** Later in the morning, appellant was involved in an automobile accident while driving Ivory Franklin's car in Tennessee. Appellant abandoned the vehicle. Then, around 6:00 p.m., after receiving reports of a suspicious person in a Nashville, Tennessee neighborhood, two police officers found and questioned appellant. Appellant gave officers a false name and claimed to be a juvenile. He carried no identification, and his answers to questions were suspicious. An officer then asked appellant about the bulge in his jacket pouch. When appellant began to reach into that pouch, the officer told him to stop and tried to frisk him. However, appellant ran from the officers. Upon catching up to him, the officers searched appellant, found a loaded gun and jewelry, and arrested appellant for carrying a weapon and resisting a stop. The gun later was determined to be Ivory's, and a firearms examiner concluded that it had fired the bullet recovered from Ophelia Franklin's skull. Blood was found on the shoes, pants, and jacket that appellant was wearing when he was arrested.

**{¶6}** Two days later, when appellant was in police custody in a Tennessee jail, a Dayton police detective spoke with him. After receiving *Miranda* warnings, appellant signed a waiver and said to the detective, "You figured out I did it." When asked why he committed the crimes, appellant replied, "They weren't treating me

right." He said that he and his family "were always bumpin' heads" and that they had threatened to kick him out of the house. He also said that he had killed his relatives because Anthony Franklin had raped him when appellant was fourteen years old.

### C. Trial Court Proceedings

{¶7} Appellant was charged in a seventeen-count indictment with four death specifications,[1] inter alia, for the aggravated murders of Ophelia Franklin,

---

1.    {¶a}    Appellant was charged as follows:

{¶b}    Count I: Aggravated arson, R.C. 2909.02(A)(2);

{¶c}    Count II: Aggravated arson to the person of Anthony Franklin, R.C. 2909.02(A)(1);

{¶d}    Count III: Aggravated arson to the person of Ivory Franklin, Sr., R.C. 2909.02(A)(1);

{¶e}    Count IV: Aggravated robbery of Ophelia Franklin, R.C. 2911.01, with an accompanying firearm specification, R.C. 2941.145;

{¶f}    Count V: Aggravated robbery, R.C. 2911.01(A)(3);

{¶g}    Count VI: Aggravated murder of Anthony Franklin, R.C. 2903.01(B), with death specifications for violations of the following: R.C. 2929.04(A)(3) (murder for the purpose of escaping detection for another offense), R.C. 2929.04(A)(7) (murder during commission of aggravated robbery), R.C. 2929.04(A)(7) (murder during commission of aggravated arson), and R.C. 2929.04(A)(5) (multiple murder);

{¶h}    Count VII: Aggravated murder of Anthony Franklin with prior calculation and design, R.C. 2903.01(A), with the same specifications as were attached to Count VI;

{¶i}    Count VIII: Aggravated murder of Ivory Franklin, Sr. with prior calculation and design, R.C. 2903.01(A), with the same specifications as were attached to Count VI;

{¶j}Count IX: Aggravated murder (felony-murder) of Ivory Franklin, Sr., R.C. 2903.01(B), with the same specifications as were attached to Count VI;

{¶k}    Count X: Aggravated murder of Ophelia Franklin with prior calculation and design, R.C. 2903.01(A), with a firearm specification, R.C. 2941.145, and the same specifications as were attached to Count VI;

{¶l}    Count XI: Aggravated murder (felony-murder) of Ophelia Franklin, with the same specifications as were attached to Count X;

{¶m}    Count XII: Aggravated arson for exposing firefighter Russell Scott Bennett to a risk of serious physical harm, R.C. 2909.02(A)(1);

{¶n}    Count XIII: Aggravated arson for exposing firefighter Michael Fink to a risk of serious physical harm, R.C. 2909.02(A)(1);

{¶o}    Count XIV: Aggravated arson for exposing Captain Barry Holbrook to a risk of serious physical harm, R.C. 2909.02(A)(1);

{¶p}    Count XV: Aggravated arson for exposing firefighter Kevin Bushur to a risk of serious physical harm, R.C. 2909.02(A)(1);

{¶q}    Count XVI: Aggravated arson for exposing firefighter Kevin Green to a risk of serious physical harm, R.C. 2909.02(A)(1); and

{¶r}    Count XVII: Aggravated arson for exposing firefighter Todd Shiverdecker to a risk of serious physical harm, R.C. 2909.02(A)(1).

Ivory Franklin, Sr., and Anthony Franklin. Appellant entered a plea of not guilty by reason of insanity and claimed to be incompetent to stand trial. The trial court rejected this claim, and the case proceeded to trial.

**{¶8}** At trial, the judge granted defense motions to dismiss two of the counts against appellant.[2] The jury found appellant guilty of all remaining counts and specifications. After the penalty phase, the jury recommended death sentences on each aggravated murder count. The trial court sentenced appellant to death on each aggravated murder count and to a total of 91 years in prison on the noncapital counts in the indictment.

**{¶9}** The cause is now before this court upon an appeal as of right. Appellant has set forth seventeen propositions of law for our consideration, which we have reviewed thoroughly. We have considered the death penalty for appropriateness and proportionality, and we have independently weighed the aggravating circumstances against the evidence presented in mitigation. For the reasons that follow, we affirm appellant's convictions and the sentences imposed.

## II. DISCUSSION

### Pretrial Issues

#### A. Search and Seizure

**{¶10}** In his ninth proposition of law, appellant contends that police conducted an improper search and seizure and asks this court to reverse the trial court's denial of his motion to suppress items seized in connection with the search. These include the gun used to shoot Ophelia Franklin and the jewelry stolen from her. He also seeks suppression of all post-arrest statements that he made as a result.

**{¶11}** We reject this argument. It is well settled that a law enforcement official is permitted to stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that "criminal

---

2. The motions for judgment of acquittal were granted with respect to Counts XV and XVII.

4

activity may be afoot," even if the officer lacks probable cause. *Terry v. Ohio* (1968), 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889. Thus, police officers are generally permitted to approach an individual, even if they have no basis to conclude that he is suspicious, and may ask questions of and request identification from the individual "as long as the police do not convey a message that compliance with their requests is required." *Florida v. Bostick* (1991), 501 U.S. 429, 435, 111 S.Ct. 2382, 115 L.Ed.2d 389.

{¶12} In this case, the police were justified in making a *Terry* stop. Not until the officer ordered appellant to submit to a frisk was there any demonstration of authority that would constitute a stop. Instead of submitting to the officers' order to stop and put his hands behind his back, which began a reasonable search for Fourth Amendment purposes, appellant fled. Based on these facts, the trial court correctly concluded that this stop and the subsequent arrest were justified. The officers had been alerted that illegal activity might be taking place at the location where appellant was found. Appellant could not provide identification and was evasive in his responses to the officers. Additionally, the bulging pouch of appellant's jacket suggested a weapon and caused the officers to fear for their safety. These facts created more than enough reasonable suspicion to warrant the *Terry* stop.

{¶13} In *Pennsylvania v. Mimms* (1977), 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331, an officer observed a bulge in the jacket of a motorist whom he had stopped. When the officer frisked him, he found a handgun. The frisk was held permissible since it was reasonable for the officer to discern that the motorist was armed and could pose a threat. Similarly, in the case sub judice, the officers could have reasonably concluded that there was a risk to their safety. Under the totality of the circumstances, the stop and frisk and the subsequent arrest were justified, and the evidence obtained as a result was admissible. Appellant's ninth proposition of law is overruled.

Trial Issues

*B.  Competence to Stand Trial*

{¶14} In his third proposition of law, appellant contends that the trial court sua sponte should have reconsidered the issue of whether he was competent to stand trial.  This argument lacks merit.

{¶15} The question of whether to hold a competency hearing after the commencement of trial is left to the court's discretion. *State v. Rahman* (1986), 23 Ohio St.3d 146, 156, 23 OBR 315, 492 N.E.2d 401.  A defendant has a constitutional right to such a hearing only when there is sufficient "indicia of incompetence" to alert the court that an inquiry is needed to ensure a fair trial.  *State v. Berry* (1995), 72 Ohio St.3d 354, 359, 650 N.E.2d 433.  Considerations in this regard might include supplemental medical reports, specific references by defense counsel to irrational behavior, and the defendant's demeanor during trial.  See *State v. Chapin* (1981), 67 Ohio St.2d 437, 21 O.O.3d 273, 424 N.E.2d 317, paragraph one of the syllabus.

{¶16} Appellant points to psychologist Dr. Eugene Cherry's finding that appellant was a paranoid schizophrenic as an indication of his incompetency.  However, this evidence did not need to be reconsidered because similar testimony had been presented at appellant's pretrial competency hearing.  Furthermore, appellant argues that his erratic behavior at trial, which included belching loudly and interrupting the judge, further demonstrated his incompetency.  Although these actions did indeed constitute strange behavior, they illustrated a pattern of rudeness rather than incompetency to stand trial.  Therefore, the evidence upon which appellant relies does not shed any new light on appellant's ability to understand the proceedings, to interact with his counsel, or to assist in his defense.  Consequently, we do not believe that the trial court abused its discretion by declining to revisit the competency issue.  Appellant's third proposition of law is without merit.

*C.  Denial of Continuance*

{¶17} Appellant also contends, in proposition of law number ten, that the trial court deprived him of due process in denying his motion for a continuance. We disagree. In appellant's case, arson investigators William Fricker and William Yeazell inspected the victims' home after the fire. The defense had planned to call Fricker as an expert witness on arson, but he died unexpectedly two days before the defense began its case. Appellant moved for a continuance, seeking one to two additional weeks to find a new expert. The trial court denied the motion, pointing out that appellant had another expert witness, Yeazell, available to testify. Before resting his case, appellant renewed the motion and briefly proffered Fricker's expected testimony. The motion was once again denied.

{¶18} The decision of whether to grant a continuance rests in the broad discretion of the trial court. See, e.g., *Morris v. Slappy* (1983), 461 U.S. 1, 11, 103 S.Ct. 1610, 75 L.Ed.2d 610; *State v. Lorraine* (1993), 66 Ohio St.3d 414, 423, 613 N.E.2d 212. While there is no bright-line test for determining whether a continuance should be allowed, a court should be guided by consideration of several factors, including the length of the requested delay, whether other continuances have been requested and received, the inconveniences likely to result, the reasons for the delay, and whether the defendant contributed to the circumstances giving rise to the need for delay. *State v. Unger* (1981), 67 Ohio St.2d 65, 67-68, 21 O.O.3d 41, 423 N.E.2d 1078.

{¶19} Applying these factors, we find that the trial court did not abuse its discretion in denying the request for a continuance. Appellant requested the delay in the middle of the trial, which would have inconvenienced everyone involved and would have placed the jurors out of the court's control for a great deal of time. Additionally, this continuance would have been the second granted to the defense; the court had previously postponed the beginning of the trial for seven months due to an auto accident involving one of appellant's attorneys. Moreover, the defense

called Yeazell, another arson expert, who had inspected the home with Fricker. These factors weighed heavily against granting the continuance.

{¶20} It is true that the timing of the death was no fault of the defense, but this factor does not override the numerous reasons for denying appellant's motion. Upon our review of the trial court's decision to deny a continuance, we find that the surrounding facts and circumstances support that decision. Proposition of law number ten is without merit.

### D. Photographs

{¶21} In his fourth proposition of law, appellant argues that certain post-mortem photographs of the victims should have been excluded from evidence because they are gruesome. Gruesome photographs are inadmissible in capital cases if their probative value is outweighed by the danger of unfair prejudice to the defendant, or if they are repetitive or cumulative. *State v. Morales* (1987), 32 Ohio St.3d 252, 258, 513 N.E.2d 267. Exhibits 56 and 61, two photos that feature the covered bodies of Ophelia Franklin and Ivory Franklin lying in the back of an ambulance and a close-up of Ivory's bloody stocking feet, are not gruesome, and their admission was proper.

{¶22} Although separate autopsy slides presented by the prosecution were gruesome, their probative value was high, since they corroborated the medical examiner's testimony as to the nature and extent of the victims' injuries. They were also pertinent to prove prior calculation and design.

{¶23} We also note that the record contains a lengthy discussion of whether individual photographs should be admitted. In fact, the judge excluded three slides and five photos when applying the above test. This action convinces us that the trial judge subjected each photo to the proper scrutiny before admitting them. Proposition of law number four is overruled.

### E. Prosecutorial Misconduct

{¶24} In his fifth proposition of law, appellant alleges several instances of prosecutorial misconduct. The conduct of a prosecuting attorney cannot be the ground for error unless the conduct deprived the defendant of a fair trial. *State v. Maurer* (1984), 15 Ohio St.3d 239, 266, 15 OBR 379, 473 N.E.2d 768. A claim of prosecutorial misconduct is waived unless raised at trial, and if so waived, can serve as the basis for relief only if the conduct constitutes plain error. *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 357, 662 N.E.2d 311. Plain error analysis requires an inquiry into whether, but for the error, the outcome of the trial would have been different. Id. In each instance of alleged prosecutorial misconduct in the case at bar, defense counsel failed to object. Therefore, our review is subject to a plain error analysis.

{¶25} Appellant first asserts error in the prosecutor's eliciting of evidence of victim impact. One alleged instance concerned testimony from Ophelia Franklin's daughter. Stephanie Franklin testified that, around the time that appellant's grandparents had directed appellant to find work, go to school, or leave their home, he "would do things to intentionally upset my mother or hurt my mother * * * things like go into the bathroom mid-afternoon and stay in there for three hours. She has a bladder problem. He would do it intentionally." Appellant contends that this testimony was irrelevant and constitutes prosecutorial misconduct. We disagree, because the testimony was relevant to show that appellant had a penchant for causing harm to Ophelia. Since it was relevant, there was no plain error and thus no misconduct.

{¶26} Appellant also argues that evidence introduced at trial regarding appellant's tattoos was irrelevant and inflammatory. Two tattoos depicted a tombstone bearing the words "R.I.P….Franklin's" and the phrase "BOUT IT BOUT IT" above the drawing. Another tattoo read "URTRU SOLDIER", and a fourth displayed the letters "CCP," referring to appellant's association with the Chelsea Court Players, a group whose members were said to "smoke pot together

[and] have a good time." Any references to these tattoos were relevant to counter the defense theory that appellant was delusional. As the prosecution argued, the first three tattoos demonstrate a manifestation of bravado by appellant regarding the murders and were relevant to rebut the defense's argument. The "CCP" tattoo was also relevant, since the prosecution used it to show appellant's legitimate fear of a local gang. This evidence rebutted the defense's theory that appellant's concern about being harmed by a local gang was delusional, since it tended to show his possible membership in a rival gang. Therefore, the presentation of these tattoos was not prosecutorial misconduct.

{¶27} Appellant also alleges prosecutorial misconduct when the prosecutor described appellant as "rude," "conniving," "mean," and "one of the most mean-spirited individuals you will ever encounter." We have stated that "[t]he prosecution may, of course, comment on the accused's appearance." *State v. Brown* (1988), 38 Ohio St.3d 305, 317, 528 N.E.2d 523. Similarly, this rule can be extended to commentary on a defendant's actions at trial. Given appellant's rude demeanor at trial, the prosecutor's characterization of appellant was not prosecutorial misconduct. It is clear that the prosecutor was not merely undertaking a personal attack on appellant. Rather, the labeling of appellant summed up the argument that his personality traits were consistent with that of a cold-blooded killer. Thus, the characterizations did not constitute misconduct for which a reversal is warranted.

{¶28} In another assertion of misconduct, appellant contends that the prosecutor improperly accused one of the defense's expert witnesses, arson investigator William Yeazell, of lying on the stand. While it is true that the prosecution should not be permitted to refer to defense evidence as "lies" when nothing supports such an accusation, *State v. Stephens* (1970), 24 Ohio St.2d 76, 82, 53 O.O.2d 182, 263 N.E.2d 773, in the instant matter there was evidence to corroborate the prosecution's observation. For instance, Yeazell testified that, as

an arson investigator, he would not form an opinion as to the cause of a fire until he had sent samples to the laboratory and had seen the resulting lab report. The prosecutor countered with two reports that Yeazell had written for the State Fire Marshal's Office before he had seen lab results. Additionally, rebuttal witnesses said that Yeazell had testified untruthfully about his conversations with them. Yeazell's credibility was called into question by the prosecution and was properly considered by the jury. When the prosecutor stressed this point by characterizing the witness's testimony as "lies," he was merely highlighting what the evidence could be seen to indicate. This was entirely proper.

{¶29} A more difficult matter is appellant's assertion that it was misconduct for the prosecution to suggest at trial that the defense had planted evidence. In fact, the trial judge referred to this characterization as "improper" and "illegitimate." However, we do not find plain error.

{¶30} Yeazell had inspected the fire scene at 39 Riegel Street on a few previous occasions but claims not to have observed a space heater in the center room of the house until his final visit. In Yeazell's opinion, the heater had fallen on its side and had started the fire. Conversely, the state argues that the evidence supports the conclusion that the heater was not in the house when it burned, and contends that planting of evidence was a plausible inference, especially since Yeazell's credibility had been impeached.

{¶31} We find that the prosecution's statements did not deny appellant a fair trial since they did not misstate or manipulate the evidence. Instead, the argument was conjoined with an attack on Yeazell's credibility. When considered in this light, it cannot be said that, but for the error, the verdict would have been otherwise. See *State v. Johnson* (1989), 46 Ohio St.3d 96, 102, 545 N.E.2d 636.

{¶32} None of appellant's assertions of prosecutorial misconduct has merit, so we find no plain error. Appellant's fifth proposition of law is overruled.

*F. Ineffective Assistance*

**{¶33}** In his seventh proposition of law, appellant claims that his counsel failed to render effective assistance at various points during trial. "To win a reversal on the basis of ineffective assistance of counsel, the defendant must show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." *State v. Jones* (2001), 91 Ohio St.3d 335, 354, 744 N.E.2d 1163, citing *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. To show such prejudice, "the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus.

**{¶34}** Appellant first alleges ineffective assistance during voir dire by his trial counsel's failure to ensure that the proper standard was used to qualify the jury for a capital case. We disagree. The relevant inquiry during voir dire is whether the juror's beliefs would prevent or substantially impair his or her performance of the duty in accordance with the instructions and oath. *Wainwright v. Witt* (1985), 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841. In the present case, the trial judge asked jurors whether they were capable of signing a death verdict. Clearly, a juror who is incapable of signing a death verdict demonstrates substantial impairment in his ability to fulfill his duties. Although the judge's inquiry differed in form from that endorsed by the *Witt* court, the substance of his interrogation was the same. Thus, the failure to object to the judge's line of questioning in voir dire did not constitute deficient performance by appellant's counsel.

**{¶35}** Appellant next argues that his counsel failed to properly question prospective jurors about pretrial publicity in an effort to support a motion for a change of venue. Since the record is replete with instances where the trial judge asked questions regarding pretrial publicity, we find that trial counsel's decision not to elicit more answers from the jurors was acceptable.

**{¶36}** Appellant further contends that counsel should have objected when the trial judge told prospective jurors that information from the media constituted "facts." In particular, the judge stated that certain things mentioned in the media "are all facts. * * * But that doesn't tell you what happened, does it?" Furthermore, he stated to the jurors that when they read or hear reports in the media, "you really don't know if that's how it happened."

**{¶37}** The trial judge's statements were not improper. By "fact," the judge did not imply that he meant "truth." Instead, he went out of his way to stress that media statements might not be true and that the jurors must make their decisions without regard to extraneous influences. Thus, there was no need for appellant's counsel to object.

**{¶38}** Appellant next contends that his attorneys should have objected to the trial court's statements that the jury's recommendation concerning the appropriate penalty to be imposed would be a recommendation and that if the jury recommended death, the judge would independently determine whether the recommendation was supported by proof beyond a reasonable doubt. This contention is also flawed, since the trial court's statements accurately reflect Ohio law. *State v. Keenan* (1998), 81 Ohio St.3d 133, 153, 689 N.E.2d 929; *State v. Rogers* (1986), 28 Ohio St.3d 427, 28 OBR 480, 504 N.E.2d 52, paragraph one of the syllabus.

**{¶39}** Appellant further contends that the trial court "forced [counsel] into ineffectiveness" by not permitting them to ask jurors during voir dire about potential mitigating evidence. Consequently, appellant asserts, his counsel were unable to ensure the seating of a fair and impartial jury. We find that the failure to object to the trial court's restrictions on questioning did not amount to error. "[W]eighing aggravating circumstances against mitigating factors is a complex process. * * * Realistically, jurors cannot be asked to weigh specific factors until they have heard all the evidence and been fully instructed on the applicable law."

*State v. Lundgren* (1995), 73 Ohio St.3d 474, 481, 653 N.E.2d 304. The defense was given the opportunity to otherwise question affected jurors, and the trial judge was not required to permit defense counsel to inquire as to factors that had not yet been admitted into evidence.

{¶40} Appellant also presents myriad allegations of ineffective assistance during the guilt phase of trial. He argues that his attorneys should have moved to suppress his May 6, 1997 statements to police while he was being transported from Tennessee to Ohio on the ground that the *Miranda* warnings he had been given in Nashville had gone stale and should have been re-administered. This argument is erroneous. Interrogation involves express questioning or words or actions reasonably likely to elicit an incriminating response. *Rhode Island v. Innis* (1980), 446 U.S. 291, 301-302, 100 S.Ct. 1682, 64 L.Ed.2d 297. Since the record does not yield evidence of an interrogation, any statements made by appellant were admissible without regard to *Miranda* warnings, and the filing of any motion on this premise would have been futile.

{¶41} Appellant next contends that his counsel acted ineffectively by failing to request a second competency hearing. However, we have found in our discussion of appellant's third proposition of law that no such hearing was warranted. He also alleges that expert witnesses Yeazell and Dr. Cherry were discredited on cross-examination because his counsel failed to adequately prepare them. This argument is not supported by the record.

{¶42} Nor do we find merit in appellant's argument that his counsel were guilty of ineffective assistance by failing to object to prosecutorial misconduct in closing argument and by failing to object to hearsay, leading questions, and improper jury instructions. A reasonable attorney may decide not to interrupt his adversary's argument as a matter of strategy. See *State v. Keene* (1998), 81 Ohio St.3d 646, 668, 693 N.E.2d 246. Furthermore, appellant cites no specific instances of hearsay or leading questions. Appellant's argument that counsel should have

objected to incorrect jury instructions given with respect to voluntary-manslaughter is without merit, because we find below that the instruction was not prejudicial.

{¶43} Appellant further contends that his counsel should not have stipulated to the chain of custody on the stolen goods found on appellant's person after his arrest. "However, the state was not required to prove a perfect, unbroken chain of custody." Id. at 662, 693 N.E.2d 246. Even if the chain of custody had indeed been broken, this fact goes to the weight, rather than the admissibility, of the evidence. *State v. Richey* (1992), 64 Ohio St.3d 353, 360, 595 N.E.2d 915. Because the jury would have considered this evidence in any event, the stipulation did not prejudice appellant.

{¶44} Appellant also asserts that his counsel were ineffective because they failed to object to appellant's being handcuffed and because they failed to request a hearing on the issue. Although shackling a defendant can be prejudicial, we find no apparent prejudice here (see discussion of second proposition of law).

{¶45} Appellant argues that his lawyers should have objected to the blanket re-admission of guilt phase evidence into the penalty phase and that they should have sought merger of the four death penalty specifications against appellant into two. We discuss these issues at length (see propositions of law one and six) and have determined that appellant was not prejudiced in these respects. The same can be said about appellant's contention that his counsel should not have waived his presence during discussions with the trial judge. Since we cannot find that there exists a reasonable probability that, but for counsel's actions, the result of the trial would have been different, there was no prejudice.

{¶46} We find no basis to reverse appellant's convictions or sentences on the grounds of ineffective assistance of counsel. Therefore, proposition of law number seven is overruled.

*G. Merger*

**{¶47}** In his sixth proposition of law, appellant argues that several counts and specifications in his indictment should have been merged. Appellant was indicted on two counts of aggravated murder for each of the three victims. He now asserts that the trial court should have required the state to elect, during the penalty phase of trial, only one aggravated murder count to be submitted to the jury for each victim. We reject this argument, as this court has consistently held otherwise. See *State v. Goff* (1998), 82 Ohio St.3d 123, 135, 694 N.E.2d 916; *State v. Waddy* (1992), 63 Ohio St.3d 424, 447, 588 N.E.2d 819.

**{¶48}** Appellant also argues that the six aggravated arson counts against him are allied offenses of similar import and should merge into one, because he set only one fire and thus committed only one arson. Under R.C. 2909.02(A)(1), aggravated arson requires that a defendant knowingly set a fire that creates a substantial risk of serious harm or injury to another person. Even though appellant set only one fire, each aggravated arson count recognizes that his action created a risk of harm to a separate person. In *State v. Jones* (1985), 18 Ohio St.3d 116, 117, 18 OBR 148, 480 N.E.2d 408, the court construed this state's aggravated vehicular homicide statute to allow convictions for separate violations "for each person killed as the result of a single instance of [the defendant's] reckless operation of his vehicle." By analogy with *Jones*, appellant's conduct caused six offenses of dissimilar import because six different people were placed at risk. For this reason, appellant's argument fails.

**{¶49}** Appellant next asserts that the trial court should have merged the four death specifications into two for the penalty phase of trial so that the jury would have considered only the aggravated arson and aggravated robbery specifications. This argument is based on the rule that where two or more aggravating circumstances arise from the same act or indivisible course of conduct and are thus duplicative, they will be merged for sentencing purposes. *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph five of the syllabus.

Appellant first argues that the R.C. 2929.04(A)(3) specification (escaping detection) should have merged into the aggravated arson felony murder specification for the penalty phase of his trial. The state asserts that appellant would have been entitled to a merger of the escaping detection and felony murder specifications had he so requested, but, in any event, reversal is not required.

{¶50} Where duplicative aggravating circumstances are submitted to a jury but should have been merged during the penalty phase of trial and this court effects such a merger upon appellate review, "resentencing is not automatically required where the reviewing court independently determines that the remaining aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt and that the jury's consideration of duplicative aggravating circumstances in the penalty phase did not affect the verdict." *Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph five of the syllabus. Upon our thorough weighing of the aggravating circumstances in this case against the mitigating factors, we find beyond a reasonable doubt that the jury's verdict here would have been no different in the absence of the allegedly duplicative aggravating circumstances. Our independent review cures any error.

{¶51} Appellant also asserts that the aggravated arson specification should have been merged with the course-of-conduct specification. We do not agree. This court uses the same analysis to determine whether two aggravating circumstances merge as it utilizes to decide whether two offenses are allied offenses of the same import. Id. at 197-198, 15 OBR 311, 473 N.E.2d 264. In summary, this test requires two specifications to merge only if their elements correspond to such a degree that commission of conduct described in one specification results in commission of conduct described in the other. *State v. Logan* (1979), 60 Ohio St.2d 126, 128, 14 O.O.3d 373, 397 N.E.2d 1345.

{¶52} The aggravated arson specification has no such correspondence with the course of conduct specification. The course of conduct specification, R.C.

2929.04(A)(5), imposes punishment for killing multiple victims through a course of conduct. R.C. 2929.04(A)(7) imposes a specification when the offender has effected a killing while committing aggravated arson. Though the arson had the effect of producing multiple murder victims, committing multiple murders does not always involve arson as the course of conduct leading to the deaths. Thus, we fail to see how these specifications can meet the above test, and we decline to impose a merger.

**{¶53}** On the subject of the death penalty specifications, appellant lastly asserts that the instructions given by the trial court allowed the jury to group together all of the aggravating circumstances for all of the counts against appellant. It is true that "[o]nly the aggravating circumstances related to a given count may be considered in assessing the penalty for that count." *State v. Cooey* (1989), 46 Ohio St.3d 20, 544 N.E.2d 895, paragraph three of the syllabus. No lengthy analysis is required here, since we find no evidence that the lower court violated this maxim. Its instructions concisely guided the jury in its consideration of the aggravating circumstances.

**{¶54}** Appellant's assertions relating to his sixth proposition of law are all without merit. We decline to grant a reversal on this basis.

*H. Sufficiency of Evidence*

**{¶55}** In appellant's thirteenth proposition of law, he asserts that the state failed to prove prior calculation and design as charged in Counts VII, VIII, and X. We reject this argument.

**{¶56}** In reviewing a record for sufficiency of the evidence, "[t]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Emphasis sic.) *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560. See, also, *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. The following considerations are pertinent to determining whether prior calculation and design exist: "(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or 'an almost instantaneous eruption of events?' " *State v. Taylor* (1997), 78 Ohio St.3d 15, 19, 676 N.E.2d 82, citing *State v. Jenkins* (1976), 48 Ohio App.2d 99, 102, 2 O.O.3d 73, 355 N.E.2d 825. This court has never set forth a bright-line test for discerning the presence or absence of prior calculation and design but instead undertakes a unique analysis of the facts of each case. *Taylor*, 78 Ohio St.3d at 20, 676 N.E.2d 82. In the instant matter, the facts demonstrate prior calculation and design.

**{¶57}** Obviously, appellant knew his victims very well, since they were close relatives with whom appellant resided. His relationship with each was clearly strained. The evidence indicates that despite the wishes of Ophelia and Ivory Franklin, appellant created friction by refusing to get a job or attend school. In fact, approximately two weeks prior to the murders, his grandparents gave him thirty days to find another place to live, a prospect that caused appellant to act in a hostile manner toward his family.

**{¶58}** Moreover, appellant was at odds with Anthony Franklin. While he was being questioned by Dayton police in Nashville, appellant, in reference to Anthony, exclaimed, "Son of a bitch raped me, that's why I killed 'em all. * * * He raped me when I was fourteen, and the old man knew about it, but that was his son, so he didn't do anything about it." Appellant also revealed that Anthony had accused him of being gay.

**{¶59}** There is also evidence to support the view that the accused gave thought and preparation to choosing the murder weapon and the murder site. He used various weapons on the three victims. He shot Ophelia and struck her repeatedly with a blunt instrument, and beat Ivory and Anthony with blunt instruments as well. Unsatisfied, appellant proceeded to intentionally set a fire. These events occurred in a place where appellant knew that all three individuals could be found at once.

**{¶60}** Finally, it does not appear that the murders were instantaneous events, but instead were carried out over a period of time. "[T]he jury could find prior calculation and design, * * * based on the protracted nature of the murder." *State v. Allen* (1995), 73 Ohio St.3d 626, 632, 653 N.E.2d 675. To that end, this court has found the presence of prior calculation and design in much less compelling but equally disturbing circumstances. *Taylor*, 78 Ohio St.3d 15, 676 N.E.2d 82*; State v. Toth* (1977), 52 Ohio St.2d 206, 6 O.O.3d 461, 371 N.E.2d 831; *State v. Robbins* (1979), 58 Ohio St.2d 74, 12 O.O.3d 84, 388 N.E.2d 755; *State v. Cotton* (1978), 56 Ohio St.2d 8, 10 O.O.3d 4, 381 N.E.2d 190. We thus conclude that, when reviewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found that appellant committed the acts in Counts VII, VIII, and X with prior calculation and design. Therefore, we reject appellant's thirteenth proposition of law.

*I. Jury Instructions*

{¶61} In his fourteenth proposition of law, appellant challenges jury instructions in the guilt phase of his trial. He identifies four alleged errors. Since appellant failed to object to these instructions, he has waived all but plain error. *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus.

{¶62} The first alleged error is that the trial court prevented the jury from considering Dr. Cherry's testimony for purposes of determining appellant's guilt. Specifically, Dr. Cherry's testimony was that appellant stated that his uncle had accused him of being gay. The jury's belief that appellant killed as a result of provoked rage would have reduced his offense to voluntary manslaughter, as defined by R.C. 2903.03. The trial court addressed the jury as follows:

{¶63} "You have heard the testimony regarding certain statements * * * made by the Defendant to Dr. Cherry and Dr. Martin during interviews with the Defendant. You are instructed that no statements made by the Defendant to these doctors may be considered * * * in determining the issue of the Defendant's guilt as to any of the offenses charged * * *. You may consider these statements on the issue of sanity."

{¶64} R.C. 2945.371 provides for a court-ordered mental evaluation of a defendant who places his competence or sanity at issue. R.C. 2945.371(J) provides: "No statement that a defendant makes in an evaluation or hearing under * * * this section * * * shall be used against the defendant on the issue of guilt in any criminal proceeding." In light of this statute, the court was correct in its instruction that his statements to Dr. Martin, the state's psychologist, could be considered only on the issue of sanity and not guilt. However, appellant now contends that, with respect to Dr. Cherry, this was error, because R.C. 2945.371(J) applies only to statements made during a court-ordered mental evaluation. While it is true that the statute applies to court-ordered mental evaluations, it does not follow that appellant had a

right to have his out-of-court assertions to Dr. Cherry, who was not court-appointed, considered on the issue of guilt. Such statements are hearsay and are not to be considered for the truth of the matters asserted therein. See Evid.R. 801(C) and 802. Thus, it was proper for the trial court to restrict use of the statements to Dr. Cherry.

{¶65} Appellant next asserts that another instruction given by the trial court improperly created a "mandatory rebuttable presumption of *mens rea.*" The lower court instructed the jury that "[t]he purpose with which a person acts is determined from the manner in which the action is done, the means used, and all other facts and circumstances in evidence." This court has rejected claims against similar instructions on other occasions. See *State v. Montgomery* (1991), 61 Ohio St.3d 410, 414-415, 575 N.E.2d 167; *State v. Wilson* (1996), 74 Ohio St.3d 381, 392, 659 N.E.2d 292. Hence, appellant cannot show plain error.

{¶66} Appellant also argues that the instruction given by the trial court on causation was prejudicial. It stated, "The Defendant's responsibility is not limited to the immediate or most obvious result of * * * his act. The Defendant is also responsible for the natural and foreseeable consequences that follow in the ordinary course of events from his action." Appellant argues that this instruction, by defining causation in terms of foreseeability, permitted a conviction without a finding of specific intent to kill.

{¶67} Although we have found that this causation instruction is confusing, see *State v. Burchfield* (1993), 66 Ohio St.3d 261, 263, 611 N.E.2d 819, we have stated, "The use of that instruction, however, does not require reversal where the instructions as a whole make clear that the jury must find purpose to kill in order to convict." *State v. Phillips* (1995), 74 Ohio St.3d 72, 100, 656 N.E.2d 643. Here, the trial court gave thorough instructions to the jury on the requirement of purpose and intent after giving the causation instruction. See *State v. Goodwin* (1999), 84

Ohio St.3d 331, 346, 703 N.E.2d 1251. Thus, the causation instruction was not plain error.

{¶68} Finally, appellant objects to the following instruction from the trial court:

{¶69} "If you find the State proved beyond a reasonable doubt all of the essential elements of the offense of Aggravated Murder as charged in any one or more of the Counts of the Indictment, then your Verdict must be Guilty of that offense, and in that event, you will not consider any lesser charge.

{¶70} "If you find that the State failed to prove beyond a reasonable doubt Aggravated Murder, or if you are unable to agree that the State proved Aggravated Murder, you will proceed with your deliberations and decide whether the State has proved beyond a reasonable doubt the elements of the lesser included offense of Murder."

{¶71} "The jury is not required to determine unanimously that the defendant is not guilty of the crime charged before it may consider a lesser included offense." *State v. Thomas* (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph three of the syllabus. Therefore, an "acquittal first" instruction is improper. Id. at 219, 533 N.E.2d 286. We disagree with appellant's view that the jury instruction in question was an impermissible "acquittal first" instruction. The instruction was clear that the jury could proceed with deliberations to consider the lesser included offense of murder only if it was "unable to agree" that appellant was guilty of aggravated murder. There should have been no doubt in the jurors' minds that they need not unanimously dismiss the aggravated murder charge before they could address the lesser charge.

{¶72} The court also gave the jury the following instruction: "If you find that the State failed to prove any one of the essential elements of Murder, * * * [y]ou will then proceed with your deliberations and decide whether the State has proven beyond a reasonable doubt the essential elements of the lesser offense of

Voluntary Manslaughter as it applies to the death of Anthony Franklin." Appellant contends that this instruction was erroneous because voluntary manslaughter is an inferior degree, not a lesser included offense, of aggravated murder, and in fact its provocation component is a defense to aggravated murder. Yet, the jury was not permitted to consider evidence of provocation.

{¶73} "An offense is an 'inferior degree' of the indicted offense where its elements are identical to or contained within the indicted offense, except for one or more additional mitigating elements." *State v. Deem* (1988), 40 Ohio St.3d 205, 533 N.E.2d 294, paragraph two of the syllabus. Voluntary manslaughter is an inferior degree of aggravated murder. *State v. Tyler* (1990), 50 Ohio St.3d 24, 36, 553 N.E.2d 576. It is not, however, a lesser included offense of aggravated murder. *State v. Shane* (1992), 63 Ohio St.3d 630, 590 N.E.2d 272. It consists of knowingly causing a death "while under the influence of sudden passion or in a sudden fit of rage, * * * brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the [offender] into using deadly force * * *." R.C. 2903.03(A).

{¶74} The instruction was erroneous, since there was no evidence adduced to entitle appellant to a jury instruction on voluntary manslaughter. However, the erroneous instruction does not require reversal.

{¶75} In order to have a jury instruction on voluntary manslaughter included in the court's charge, a jury must be able to reasonably find that Anthony had seriously provoked appellant and that the serious provocation was reasonably sufficient to have incited him to use deadly force. *State v. Lawrence* (1989), 44 Ohio St.3d 24, 26, 541 N.E.2d 451. The only provocation alleged was Anthony's calling appellant "gay." However, this evidence was inadmissible hearsay, since it involved out-of-court statements made to Dr. Cherry and to a detective. Evid.R. 801(C) and 802. Even if the jury had been allowed to consider the statements, it could not reasonably have found that the statement was a serious provocation. The

provocation must be such that a reasonable person would be provoked to use deadly force, but "[w]ords alone will not constitute reasonably sufficient provocation to incite the use of deadly force in most situations." *Shane*, 63 Ohio St.3d 630, 590 N.E.2d 272, paragraph two of the syllabus. Anthony's use of words toward appellant did not rise to the level of sufficient provocation in this case. Therefore, the instruction, while erroneously labeling voluntary manslaughter as a lesser included offense of murder, did not amount to plain error. Regardless of the label, appellant could not be found to have committed voluntary manslaughter. Proposition of law number fourteen is overruled.

### J. Questions from Jury in Absence of Defendant

{¶76} In his eighth proposition of law, appellant contends that it was error for the trial judge to answer questions from the jury outside appellant's presence. However, appellant's counsel agreed to this action. See *State v. Green* (2000), 90 Ohio St.3d 352, 371, 738 N.E.2d 1208, citing *United States v. Gagnon* (1985), 470 U.S. 522, 105 S.Ct. 1482, 84 L.Ed.2d 486. Therefore, the issue has been waived, and a plain error analysis must be invoked. This court has held that a trial judge may not communicate with the jury in the defendant's absence. *State v. Abrams* (1974), 39 Ohio St.2d 53, 68 O.O.2d 30, 313 N.E.2d 823, paragraph one of the syllabus; *Bostic v. Connor* (1988), 37 Ohio St.3d 144, 149, 524 N.E.2d 881. However, since appellant's counsel were present via telephone and were consulted on the answer to be given, the error was harmless. *State v. Taylor* (1997), 78 Ohio St.3d 15, 25, 676 N.E.2d 82. For these reasons, the eighth proposition of law is overruled.

### Penalty Phase

### K. Handcuffing of Appellant

{¶77} In his second proposition of law, appellant alleges that the trial court violated his due process rights and his right to a fair trial and fair sentencing when it allowed him to be handcuffed with two deputies positioned beside him during the

penalty phase of his trial. He asserts that these actions forced the jury to view him as dangerous, thus prejudicing its decision on whether to impose a death sentence. Appellant cites a videotape of the lower court proceedings as evidence of the handcuffing and the presence of the security officials.

{¶78} While the state concedes in its brief that these procedures were in fact utilized, there is no written transcript of any debate as to whether the actions were improper. Appellant never objected to the handcuffs or the presence of the two deputies. Therefore, the issue is waived unless we determine that the trial court's actions were plain error. We find no such error.

{¶79} The usual practice, of course, is for a defendant to appear in court while free of shackles. *State v. Woodards* (1966), 6 Ohio St.2d 14, 23, 35 O.O.2d 8, 215 N.E.2d 568. This is the accepted procedure because the presence of restraints tends to erode the presumption of innocence that our system attaches to every defendant. *State v. Carter* (1977), 53 Ohio App.2d 125, 131, 7 O.O.3d 90, 372 N.E.2d 622. But it is widely accepted that a prisoner may be shackled where there is danger of violence or escape. *Woodards*, 6 Ohio St.2d at 23, 35 O.O.2d 8, 215 N.E.2d 568. The decision to impose such a restraint is left to the sound discretion of the trial court, *Richey*, 64 Ohio St.3d at 358, 595 N.E.2d 915, which is in a position to consider the prisoner's actions both inside and outside the courtroom, as well as his demeanor while court is in session. We also note that a court need not sit by helplessly waiting for a defendant to commit a violent or disruptive act in the courtroom before being cloaked with the power to invoke extra security measures. *Loux v. United States* (C.A.9, 1968), 389 F.2d 911, 919-920.

{¶80} While the use of restraints is a fairly unusual measure, it has been upheld in some cases. See *State v. Henry* (1997), 189 Ariz. 542, 550, 944 P.2d 57 (capital defendant had prior record of serious violent felonies); *McGervey v. State* (1998), 114 Nev. 460, 463, 958 P.2d 1203 (defendant was difficult to control in jail and had assaulted another inmate). Here, appellant demonstrated a propensity for

violence. Not only had he just been convicted of three brutal murders, but he also had stabbed a fellow inmate with a pen six times in a dispute over turning out a light. It is certainly proper to seek to prevent similar violent incidents in the courtroom.

**{¶81}** Furthermore, the testimony of Dr. Cherry, the defense's own witness, revealed that appellant "is a time bomb waiting to happen. * * * [O]ne can never tell when he will become violent." The videotape even reveals the trial judge stating that the deputy "wants permission to cuff him * * * when the verdict comes in, because he says his personality is beginning to change a little the last couple of days." These statements shed light on appellant's tendency for violence at the time.

**{¶82}** Although we stress that the preferred and encouraged practice prior to handcuffing a defendant during any phase of trial is to hold a hearing on the matter, we do not find this to be an absolute rule. Where the facts and circumstances surrounding a defendant illustrate a compelling need to impose exceptional security procedures, the trial court's exercise of discretion in this regard should not be disturbed unless its actions are not supported by the evidence before it. Had the lower court in the case sub judice held a hearing on the matter, it would be much easier to review its decision to handcuff appellant and to place the deputies with him. Even though such a hearing did not take place, we find that the trial judge's actions did not amount to plain error. Appellant's proposition of law number two is overruled.

*L. Sentencing Issues*

**{¶83}** In his first proposition of law, appellant contends that the jury was permitted to consider guilt-phase evidence that was irrelevant to the sentencing phase. In particular, he asserts that the slides showing the victims' injuries, evidence of appellant's hit-and-run accident in Tennessee, and evidence relating to the endangerment of firefighters should not have been considered by the jury. We disagree. The slides were relevant to the nature and circumstances of the multiple-

murder aggravating circumstance. The car accident, which involved a vehicle stolen from Ivory Franklin, was relevant to the aggravated robbery circumstance, and the information about the fire was relevant to the aggravated arson circumstance. Appellant's first proposition of law is overruled.

{¶84} In his twelfth proposition of law, appellant attacks the trial court's sentencing opinion. He argues that the trial court discussed the mitigating evidence but failed to articulate what factors it found and gave weight to and did not explain why the aggravating circumstances outweighed the mitigating factors. We disagree. Our review of the sentencing opinion convinces us that the lower court's discussion of the mitigating factors is sufficient to explain its weighing process.

{¶85} Appellant also argues that the trial court failed to reach its own independent judgment on imposing a death sentence, since the lower court's opinion states that the trial court "agrees with" the jury's determinations on these matters. This argument lacks merit. We find nothing to indicate that the judge did anything but undertake a separate consideration of the relevant issues and reach his own conclusion, which happens to mirror the view of the jury.

{¶86} Appellant also asserts error because the trial court, in discussing the mitigating value of appellant's youth, did not mention testimony from Dr. Cherry that appellant was not functioning above an eight-to-ten-year-old level mentally. This is incorrect. The trial court is not required to specifically address every item of evidence in its opinion, and its failure to do so does not justify an inference that the evidence was ignored. See, e.g., *State v. Sanders* (2001), 92 Ohio St.3d 245, 269-270, 750 N.E.2d 90.

{¶87} Appellant's fifteenth proposition of law challenges the trial court's decision to allow the victims' family members to address the court immediately before sentencing. Ivory Franklin, Jr. addressed the court and stated that appellant had committed "the ultimate crime" and should "be awarded the ultimate jackpot." Julius Franklin then stated that the Franklin family was "divided" but that

appellant's death would not bring back the victims or heal the family. On behalf of these family members, he asked the judge to consider imposing life imprisonment rather than the death penalty.

{¶88} Appellant now argues that admission of these statements was error, but since he did not object to them at trial, the issue has been waived absent plain error. A victim's family may not recommend a sentence in a capital case. *State v. Fautenberry* (1995), 72 Ohio St.3d 435, 439, 650 N.E.2d 878. However, where such opinion is expressed to the judge only, as was the case here, it is not reversible error unless there is some indication that the judge actually considered it in sentencing the defendant to death. Id. While appellant contends that the trial court must have considered the statements in sentencing him to death, since R.C. 2930.14(B) required the court to consider them in sentencing appellant on the noncapital crimes, we cannot concur. There is no evidence of this either in the record or in the sentencing opinion. Proposition of law fifteen is overruled.

## Settled Issues

{¶89} Two of appellant's propositions of law deal with well-settled issues. Thus, we summarily dismiss them. In his sixteenth proposition of law, appellant attacks the trial court's reasonable-doubt instruction.[3] We find that the instruction comports with R.C. 2901.05, so appellant's assertion of error should be rejected. See *State v. Van Gundy* (1992), 64 Ohio St.3d 230, 232, 594 N.E.2d 604. In his

---

3. {¶a} The trial court instructed the jury as follows:
   {¶b} "A Defendant is presumed innocent until his guilt is established beyond a reasonable doubt. The Defendant must be acquitted, that is, found Not Guilty, unless the State produces evidence which convinces you beyond a reasonable doubt of every essential element of the crime or crimes charged in the Indictment.
   {¶c} "Reasonable doubt is present when, after you have carefully considered and compared all the evidence, you cannot say you are firmly convinced of the truth of the charge or charges. It is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt. Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his or her own affairs."

seventeenth proposition of law, appellant attacks capital punishment and accompanying statutes on Eighth Amendment grounds. This court has rejected this argument on many previous occasions. See *State v. Jenkins*, 15 Ohio St.3d 164, 167-168, 15 OBR 311, 473 N.E.2d 264; *State v. Mapes* (1985), 19 Ohio St.3d 108, 116-117, 19 OBR 318, 484 N.E.2d 140; *State v. Durr* (1991), 58 Ohio St.3d 86, 97, 568 N.E.2d 674; *State v. Phillips* (1995), 74 Ohio St.3d 72, 101, 103-104, 656 N.E.2d 643.

### Independent Sentence Evaluation

{¶90} Having fully considered each of appellant's assertions of error, we must next undertake an independent review of the death sentence imposed upon appellant to determine its appropriateness and proportionality to the offenses committed. This court should affirm the death sentence "only if the * * * court is persuaded from the record that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors present in the case and that the sentence of death is the appropriate sentence in this case." R.C. 2929.05(A). In making this determination, the court must be persuaded beyond a reasonable doubt that the aggravating circumstances make the sentence appropriate. *Jenkins*, 15 Ohio St.3d at 206, 15 OBR 311, 473 N.E.2d 264. We now find beyond a reasonable doubt that the death sentence imposed by the trial court was proper.

{¶91} With respect to each murder count, the jury found four aggravating circumstances.[4] The evidence is sufficient to prove each of these aggravating circumstances beyond a reasonable doubt.[5] First of all, the testimony of arson

---

4.    {¶a}    These aggravating circumstances were as follows:
      {¶b}    1. The offense was committed for the purpose of escaping detection, apprehension, trial, or punishment for another offense, R.C. 2929.04(A)(3);
      {¶c}    2. Felony-murder predicated on aggravated robbery, R.C. 2929.04(A)(7);
      {¶d}    3. Felony-murder predicated on aggravated arson, R.C. 2929.04(A)(7); and
      {¶e}    4. Course of conduct involving two or more purposeful killings, R.C. 2929.04(A)(5).

investigator Russell Scott Bennett is sufficient to prove aggravated arson. He concluded that the fire had been set by the arsonist's pouring of accelerant on the first floor of the home and lighting it. Bennett observed that no appliances had been left on in the house, and there were no short circuits, arcs, or sparks in the electrical system that would have caused the inferno. What Bennett did find was a cigarette lighter and a container of lighter fluid that was one-quarter full on the back porch of the Franklins' home, in addition to one empty and two full gasoline containers in the back yard. Although samples taken from the burned home tested negative for accelerants, Bennett testified that this is not unusual in arson cases because an intense fire can consume accelerant residue, and water can wash it away.

{¶92} The evidence of aggravated robbery is also sufficient. Appellant was caught with Ivory's gun and Ophelia's jewelry on his person, and he had driven Ivory's car to Tennessee. Furthermore, the evidence is sufficient to support a finding that appellant acted with a course of conduct involving two or more purposeful killings. Three people were killed in a calculated manner, and this manner indicates purpose. Thus, all aggravating circumstances were proven beyond a reasonable doubt.

{¶93} Appellant offered the following in mitigation. R.C. 2929.04(B)(3) states that a mitigating factor exists if "at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of [his] conduct or to conform [his] conduct to the requirements of the law." There was a wealth of evidence presented in the lower court in support of and in opposition to this theory.

{¶94} In the penalty phase of the trial, appellant's mother testified that she had tried to induce an abortion of her son while he was in the womb, both by taking

---

5. As the state concedes, the specification under R.C. 2929.04(A)(3) merges into the felony-murder specifications, so we undertake a weighing of the remaining three aggravating circumstances only.

drugs and by sticking a pencil into her womb to "dislodge the thing." She also drank large quantities of alcohol during the pregnancy. In later times, appellant was severely abused by his mother. On the other hand, testimony indicated that appellant performed well and stayed out of trouble in elementary and middle schools, which would tend to weigh against a finding of mental disease. His former girlfriend talked of appellant as a lovable and enjoyable person at one time who exhibited more and more strange behavior as time went on.

{¶95} Appellant was examined on numerous occasions by different psychologists. Dr. Cherry testified on appellant's behalf at trial and determined that appellant was experiencing delusions and hallucinations. He further opined that appellant's mental functioning was not "above an eight to ten-year-old * * * level * * *." However, on cross-examination, Cherry admitted that he had relied on what appellant had told him with respect to his symptoms, and he conceded that malingering was a possibility. Testifying for the state, psychologist Dr. Thomas Martin, after conducting three interviews with appellant and reviewing Dr. Cherry's report, found that appellant displayed no symptoms of mental illness. He also found some indications of malingering.

{¶96} In addition, psychologist Dr. Kim Stukey undertook an evaluation of appellant and testified for the state. She found no evidence of mental illness and concluded that appellant "understood what he was doing, and * * * that what he was doing was wrong." Taking into consideration all of the expert psychiatric testimony submitted at trial, we are not inclined to submit that the evidence supports appellant's claim of mental illness. The testimony of Dr. Martin and Dr. Stukey supports our conclusion, and even Dr. Cherry's testimony leaves open the possibility that appellant was acting to feign a mental disability. Appellant's upbringing is troubling, and the resulting effect on his psyche may be tangible, but not to the extent that he was unable to appreciate the criminal nature of his acts. We find that this factor deserves little mitigating weight.

**{¶97}** Appellant also argues in mitigation that his uncle Anthony "induced or facilitated" his own murder, a mitigating factor under R.C. 2929.04(B)(1), because, appellant claimed, his uncle raped him four years earlier and called appellant "gay" on the date of the murders. He contends that this placed the offender under "duress, coercion, or strong provocation," which are mitigating factors under R.C. 2929.04(B)(2). Even if these claims are true, they do not amount to strong provocation. Mere use of offensive words directed at an offender by a victim does not rise to that level. Nor does an alleged, yet unproven, rape of the offender by a victim that occurred some four years earlier constitute strong provocation at the time of the murders. Thus, we find that appellant's contentions in this regard are void of any merit.

**{¶98}** It also has been argued that appellant's youthful age at the time of the crimes should weigh in favor of mitigation. Youth is a mitigating factor under R.C. 2929.04(B)(4). Appellant was approximately eighteen and one-half years old when he committed the murders. This factor is entitled to some weight, especially since eighteen is the minimum age for death penalty eligibility. R.C. 2929.02(A) and R.C. 2929.023.

**{¶99}** Finally, we find nothing mitigating in the nature and circumstances of the crimes. These were not simple crimes. The aggravating circumstances of multiple murder and arson-murder demonstrate a long and drawn out strategy to kill that played out over a substantial time frame. We have considered other cases in which the imposition of capital punishment was upheld and used them as benchmarks. Our research convinces us that appellant's death sentence is not excessive and is proportionate to the sentences imposed in similar factual situations. See, e.g., *State v. Webb* (1994), 70 Ohio St.3d 325, 638 N.E.2d 1023; *State v. Grant* (1993), 67 Ohio St.3d 465, 620 N.E.2d 50; and *State v. DePew* (1988), 38 Ohio St.3d 275, 528 N.E.2d 542.

**{¶100}** We find that the aggravating circumstances in this case outweigh the mitigating factors beyond a reasonable doubt. Appellant engaged in a course of conduct that involved careful planning and execution, and when his plan was brought to fruition, he left three family members dead. After a thorough review of the evidence and record before us, we can reach but one conclusion: that a death sentence is appropriate in this case.

### III.  CONCLUSION

**{¶101}** For the foregoing reasons, we affirm the judgment of the trial court and uphold the sentence of death.

Judgment affirmed.

MOYER, C.J., DOUGLAS, RESNICK, PFEIFER and LUNDBERG STRATTON, JJ., concur.

COOK, J., concurs in judgment.

_____

Mathias H. Heck, Jr., Montgomery County Prosecuting Attorney, and Carley J. Ingram, Assistant Prosecuting Attorney, for appellee.

David H. Bodiker, State Public Defender, Pam Prude-Smithers and Diane M. Menashe, Assistant State Public Defenders, and Joseph E. Wilhelm, Appellate Supervisor, for appellant.

_____