O’Neill, J.,
concurring in part and dissenting in part.
{¶ 316} A police officer lies dead in the street and a nurse stands accused of his murder. Following a trial, a jury has recommended a sentence of death, and this court is charged with independently deciding whether that is the appropriate result. A more serious matter cannot be imagined.
{¶ 317} Before affirming a sentence of death, this court is required to consider both the offense and the offender and to independently weigh all the facts and evidence disclosed in the record in the case. R.C. 2929.05(A). In order to affirm a sentence of death, a majority of this court “must be persuaded beyond a reasonable doubt that the aggravating circumstances make the sentence appropriate.” State v. Franklin, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 90. And in determining whether a death sentence is appropriate beyond a reasonable doubt, the court “shall review all of the facts and other evidence to determine if the evidence supports the finding of the aggravating circumstances * * * and shall determine whether the sentencing court properly weighed the aggravating circumstances the offender was found guilty of committing and the mitigating factors.” R.C. 2929.05(A). It is then, and only then, that the statute permits the court to determine whether the sentence of death is appropriate.
{¶ 318} This review is critical — it is the process that was designed to protect the defendant’s right to due process as well as to ensure that the death penalty is reserved for those offenders for whom the legislature intended to impose the irrevocable sanction. And in my opinion, the majority has badly missed the mark. We must be ever vigilant to ensure that we have not abdicated our role as the “13th juror” in death-penalty review, and here the majority’s analysis fails.
*316 {¶ 319} First, the court incorrectly concludes that “[t]he evidence supports Thompson’s conviction on the [R.C. 2929.04](A)(3) specification,” that is, that Thompson killed Officer Miktarian “for the purpose of escaping detection, apprehension, trial, or punishment for another offense.” The evidence unquestionably shows that Thompson committed the offenses of resisting arrest and violation of a noise ordinance. But the record also refutes the conclusion that Thompson killed the officer for the purpose of escaping responsibility for his actions. The majority’s judgment totally disregards the only witness testimony to describe the altercation. Danielle Roberson, who was a passenger in the car and witnessed the entire deadly encounter, testified that Officer Miktarian was aggressive towards Thompson from the beginning. She testified under oath that the police officer yelled at Thompson immediately upon encountering him, and that when Thompson got out of his car, the officer, without any explanation of what charge was being anticipated, slapped a handcuff on him and threatened to “let [his] dog out on [Thompson’s] ass.” It is clear that the arrest process was in progress when the altex-cation between the officer and the nurse turned deadly. When he shot Officer Miktarian and even when he was subsequently arrested, Thompson was already wearing a handcuff on one hand. Thompson explained all of this in his mitigation statement:
And at this point, after I been cuffed and the only thing he told me was music, and then after that, you know, I see and hear this dog barking, okay, and you’re trying to put me in the car with that; and, by the way, when I’m getting off the ground he threatened to release the dog on me and he said something like “Don’t do anything stupid, I will let him out”; so, now I’m thinking where is this getting ready to go, all of this behind loud music and, you know, why not a ticket or even if I was under arrest just say something, why are you throwing me around like this and slamming me around?
When he reached down to his right side I just — I could have sworn he was pulling his gun out, you know, to shoot me.
{¶ 320} Accordingly, the only evidence presented on the issue directly contradicts the theory that Thompson was trying to avoid responsibility, and the majority makes no serious attempt to show otherwise. The only reasonable explanation for this tragic event is that Thompson was confused and frightened and mistakenly concluded that Officer Miktarian planned to attack him — either by releasing the police dog or by shooting him. The court’s conclusion that Thompson shot Miktarian to avoid being detected, apprehended, or punished is *317 pure fiction. The necessary proof of that aggravating factor (“the purpose of escaping detection, apprehension, trial, or punishment for another offense committed by the offender”) can only be inferred from the fact of the crimes. Such an inference is far short of proof beyond a reasonable doubt.
{¶ 321} As a result, there are really not two aggravating factors present in this case, but instead only one: the victim’s status as a law-enforcement officer. Clearly, that aggravating factor is entitled to significant weight — an officer has died in the line of duty, and I have nothing but gratitude and sympathy for the family of Officer Miktarian. But Ashford Thompson’s mitigating factors are entitled to significant weight as well. He went to college, was a licensed practical nurse and held a steady job as a home-health-care nurse, was a runner, wrestler, and band member in high school, was involved in his community and his church, and was a law-abiding citizen. He admitted that he took the life of a police officer in this tragic encounter, and he expressed significant regret and remorse without trying to minimize his own responsibility. The evidence is uncontrovert-ed that Thompson held a license to carry a concealed weapon, which he obtained for his own protection as he practiced his profession of treating sick people in their homes in dangerous neighborhoods. The sole aggravating factor, while significant and compelling, does not outweigh Thompson’s mitigation beyond a reasonable doubt. The majority’s conclusion to the contrary rests upon cases that present more heinous crimes and less significant mitigation than that presented here.[1] By contrast, the evidence in this record establishes that this was a routine traffic stop gone tragically wrong. This case is not in the same category as the premeditated intentional taking of the life of another.
{¶ 322} Reaching the conclusion that the aggravating factors do not outweigh the mitigating factors in no way minimizes Officer Miktarian’s sacrifice, his family’s loss, or the result of Thompson’s horrible crime. This officer gave his life in defense of us all. But the mere fact that Miktarian was a police officer acting in the line of duty cannot provide a justification for imposing the death *318 sentence. The weighing of aggravating factors against mitigating factors is what R.C. 2929.05 requires, and absent a real independent weighing of a death sentence, there is no way to reasonably argue that the process that resulted in that sentence comports with due process. The majority’s failure to seriously engage in the weighing process provides yet another reason why, in my opinion, Ohio’s system of imposing and reviewing death sentences is unconstitutional. I concur in the majority’s affirmance of Thompson’s conviction, but dissent from its decision .to affirm his death sentence.
Sherri Bevan Walsh, Summit County Prosecuting Attorney, and Richard S. Kasay, Assistant Prosecuting Attorney, for appellee.
Timothy Young, Ohio Public Defender, and Rachel Troutman and Kimberly S. Rigby, Assistant Public Defenders, for appellant.

. In State v. Bryan, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, the defendant was a wanted career criminal who shot a police officer in cold blood and attempted to kill a security officer who witnessed the murder, and whose only mitigating evidence was that he felt slight remorse and that he was taught positive values as a child. Id. at ¶ 2-3. In State v. Jones, 91 Ohio St.3d 335, 345, 357, 744 N.E.2d 1163 (2001), the defendant shot a police officer in order to escape apprehension for an aggravated robbery, after having told his cousin that he would kill any officer who attempted to arrest him and arming himself with a .38-caliber revolver loaded with hollow-point bullets. In State v. White, 82 Ohio St.3d 16, 27-28, 693 N.E.2d 772 (1998), the drunken defendant killed a state trooper by shooting him in the back, having previously fled his home after tying up his mother and sister and shooting his mother in the foot and after having announced to others that “something would happen” to the next officer who pulled him over. And in State v. Mitts, 81 Ohio St.3d 223, 690 N.E.2d 522 (1998), the defendant fatally shot a police officer and an innocent bystander because of his race and then attempted to kill two other police officers, seriously wounding one of them.