[Cite as *State v. Mount*, 2014-Ohio-5334.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| | |
|---|---|
| STATE OF OHIO | C.A. No. 26941 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| SHANNON MOUNT | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 12 06 1733 |

DECISION AND JOURNAL ENTRY

Dated: December 3, 2014

MOORE, Judge.

{¶1} Defendant-Appellant, Shannon Mount, appeals from the April 25, 2103 judgment entry of the Summit County Court of Common Pleas. We affirm.

I.

{¶2} On May 31, 2012, Todd McHaddon arrived at the house of his Father, Leonard McHaddon ("Mr. McHaddon"), to take him to a doctor's appointment. Todd entered the house through an unlocked door and found his Father's dead body on the floor of his bedroom. Upon further inspection of his Father's house, Todd realized that numerous items of personal property were missing, including his Father's television, computer, wallet, cell phone, and checkbook. Also, Mr. McHaddon's 2008, white Pontiac Grand Prix was missing from the garage.

{¶3} That same day, after a high-speed chase through the streets of Akron, the police apprehended Mr. Mount driving Mr. McHaddon's 2008, white Pontiac Grand Prix. The police

also discovered numerous items of Mr. McHaddon's personal property in the vehicle, including, among other things, a computer, wallet, cell phone, and checkbook.

{¶4} Mr. Mount was indicted for one count of aggravated murder, in violation of R.C. 2903.01(A)/(B), a special felony, with a repeat violent offender specification pursuant to R.C. 2941.149; one count of aggravated robbery, in violation of R.C. 2911.01(A)(3), a felony of the first degree, with a repeat violent offender specification pursuant to R.C. 2941.149; and receiving stolen property, in violation of R.C. 2913.51(A), a felony of the fourth degree. Mr. Mount pleaded not guilty to all charges and the matter proceeded to jury trial.

{¶5} After an eight-day trial, the jury returned a verdict of guilty on the counts of aggravated murder, aggravated robbery and receiving stolen property, and the trial court later found Mr. Mount guilty of the repeat violent offender specifications pursuant to R.C. 2941.149. For purposes of sentencing, Mr. Mount's convictions for aggravated robbery with a repeat violent offender specification and receiving stolen property merged, as allied offenses of similar import, with his conviction for aggravated murder with a repeat violent offender specification. The State elected to move forward with sentencing Mr. Mount for aggravated murder with a repeat violent offender specification.

{¶6} The trial court sentenced Mr. Mount to thirty years to life imprisonment, to run consecutively with a mandatory ten years of imprisonment for the repeat violent offender specification, totaling forty years to life imprisonment.

{¶7} Mr. Mount appealed, raising two assignments of error for our review.

II.

## ASSIGNMENT OF ERROR I

[MR.] MOUNT'S CONVICTIONS FOR AGGRAVATED MURDER AND AGGRAVATED ROBBERY WERE BASED UPON INSUFFICIENT EVIDENCE AS A MATTER OF LAW.

{¶8}  In his first assignment of error, Mr. Mount argues that his convictions for aggravated murder and aggravated robbery were based upon insufficient evidence because the State failed to produce any evidence of "prior calculation and design" and/or "purpose" that would satisfy the elements of aggravated murder, pursuant to R.C. 2903.01(A)/(B), and aggravated robbery, pursuant to R.C. 2911.01(A)(3).

{¶9}  "Whether a conviction is supported by sufficient evidence is a question of law that this Court reviews de novo."  *State v. Williams*, 9th Dist. Summit No. 24731, 2009-Ohio-6955, ¶ 18, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.  The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.  "Circumstantial evidence has the same probative value as direct evidence." *State v. Lollis*, 9th Dist. Summit No. 26607, 2014-Ohio-684, ¶ 5, citing *Jenks* at paragraph one of the syllabus.  We note that "if the State relies on circumstantial evidence to prove any essential element of an offense, it is not necessary for such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction." (Internal citations and quotations omitted.) *State v. Tran,* 9th Dist. Summit No. 22911, 2006-Ohio-4349, ¶ 13.

**{¶10}** As stated above, Mr. Mount was convicted of aggravated murder in violation of R.C. 2903.01(A)/(B). R.C. 2903.01(A) states, in relevant part, that "[n]o person shall purposely, and with prior calculation and design, cause the death of another[.]" Further, R.C. 2903.01(B) states, in relevant part, that "[n]o person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, * * * aggravated robbery[.]"

**{¶11}** Mr. Mount was also convicted of aggravated robbery in violation of R.C. 2911.01(A)(3), which states that "[n]o person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following: * * * (3) [i]nflict, or attempt to inflict, serious physical harm on another."

**{¶12}** Pursuant to R.C. 2901.22 (A), "[a] person acts purposely when it is his specific intention to cause a certain result[.]" "In determining whether a defendant acted purposely, '[a] defendant's state of mind may be inferred from the totality of the surrounding circumstances.'" *State v. Patel*, 9th Dist. Summit No. 24030, 2008-Ohio-4693, ¶ 34, quoting *State v. Sullivan,* 9th Dist. Medina No. 07CA0076-M, 2008-Ohio-2390, ¶ 10, citing *State v. Harper*, 9th Dist. Summit No. 19632, 2000 WL 327231, *2 (Mar. 29, 2000). Further, "[w]here evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified." *State v. Parish*, 9th Dist. Wayne No. 2533, 1990 WL 80545, *2 (June 13, 1990), citing *State v. Robbins*, 58 Ohio St.2d 74 (1979), paragraph one of the syllabus.

There is no bright-line test for determining whether a defendant acted with prior calculation and design, so courts consider the totality of the circumstances in each case, including: "(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or 'an almost instantaneous eruption of events'?"

*State v. Guerra*, 9th Dist. Lorain No. 12CA010188, 2013-Ohio-5367, ¶ 6, quoting *State v. Taylor*, 78 Ohio St.3d 15, 19 (1997), citing *State v. Jenkins*, 48 Ohio App.2d 99, 102 (8th Dist.1976). *See also State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, ¶ 154. Additionally, "[m]otive is not an element of the crime of homicide required to be established to warrant a conviction. Proof of motive does not establish guilt, nor want of proof of motive establish innocence. If the guilt of the accused be shown beyond a reasonable doubt, it is immaterial what the motive for the crime, or whether any motive be shown." *Fabian v. State*, 97 Ohio St. 184, 189 (1918); *see also State v. Lancaster*, 167 Ohio St. 391, 397 (1958).

{¶13} As evidence of "prior calculation and design" and/or "purpose" that would satisfy the elements of aggravated murder, pursuant to R.C. 2903.01(A)/(B), and aggravated robbery, pursuant to R.C. 2911.01(A)(3), the State presented testimony, in its case-in-chief, from twenty-five witnesses, including Todd McHaddon, Dr. Dorothy E. Dean, Melanie Mauck, Alice Page, David Funk, Jr., Nick McCurry, Detective Pat McMillan, Officer Stephen Sabol, Lieutenant Roger Erwin, Detective Michael Shaeffer, Detective Rich Morrison, Christine Hammett, and Stacy Violi.

{¶14} Todd McHaddon, Leonard McHaddon's thirty-eight-year-old son, testified that, on May 30, 2012, he visited his Father from approximately 10:00 a.m. to 3:00 p.m. The next morning, at approximately 8:00 a.m., Todd arrived at his Father's house to take him to a doctor's appointment. Todd entered through an open door and discovered his Father lying on the bedroom floor. Todd immediately called 911 and attempted to roll his Father over to offer

assistance, but testified that he "barely moved [his Father] and saw that his [Father's] head was purple." Todd then told the 911 dispatcher that "there was nothing [he] could do for [his Father]." Todd further testified that he left the bedroom and noticed that the flat-screen television was missing, which prompted him to look for other missing items throughout the house. In doing so, Todd noticed that his Father's computer and computer related items were also missing. At this time, Todd testified that he "went outside to wait for the ambulance and the police to come." Todd also noticed that his Father's white Grand Prix was missing from the garage, and that his Father's wallet, checkbook and cell phone were missing from their usual locations in the house.

{¶15} Doctor Dorothy Dean, M.D., a forensic pathologist and deputy medical examiner at the Summit County Medical Examiner's Office, performed Mr. McHaddon's autopsy. During her testimony, Dr. Dean explained that Mr. McHaddon was an "obese" man, weighing 374 pounds and standing 5 foot, 4 inches tall, and was "medically fragile" due to "some very severe medical diseases." She indicated that his medical history revealed that he suffered from obstructive sleep apnea with the use of c-pap machine, hypertension, diabetes mellitus, tobacco abuse, hypercholesterolemia, depression, anxiety, spinal stenosis, and degeneration of lumbar or lumbosacral intervertebral disks. Dr. Dean also testified that the autopsy showed evidence of ligature strangulation and that "whatever was used to strangle [Mr. McHaddon] was of narrow diameter." She further testified that because Mr. McHaddon was strangled, the blood pooled in his head and there were "little dot-like hemorrhages" on his face and inside his eye lids, and injuries to the inside parts of his neck, such as bruises beneath his skin and bruises in the muscle. As to additional injuries, Dr. Dean stated that Mr. McHaddon had bruises on his lips and on the inside of his lips, possibly from someone putting their hand over his mouth, bruises on his torso

and shoulder, and contusions on his knees. Further, Dr. Dean testified that she "could not say with certainty that Mr. McHaddon fought back" while being strangled, possibly due to his weakened physical state.

{¶16} Dr. Dean testified that the cause of Mr. McHaddon's death was asphyxia due to ligature strangulation, and the manner of death was homicide. She explained that when a person is being strangled, "[u]sually [they] lose consciousness within 15 seconds or so. It takes about five minutes of continuous loss of oxygen to the brain for a person to go beyond the point of no return. Almost always the person loses consciousness before they are dead. If the pressure is applied loosely, they might not lose consciousness." Although, Dr. Dean testified that she could not give a specific time of death, she indicated that her findings are consistent with Mr. McHaddon being killed the night before his body was discovered.

{¶17} Melanie Mauck, one of Mr. McHaddon's neighbors, testified that on May 30, 2012, between the approximate hours of 5:30 p.m. and 9:00 p.m., she witnessed a man doing "a little sprint" back and forth from the side door of Mr. McHaddon's house to his garage. Ms. Mauck explained that she observed this behavior several times throughout the night while she was out smoking cigarettes in her garage. Ms. Mauck further testified that the man was carrying a "pop can" or "beer can" while going back and forth. She described him as being white, with a "high-tight" military haircut, average build, and either wearing a "camo shirt" or being heavily tattooed on his torso.

{¶18} Alice Page, another one of Mr. McHaddon's neighbors, testified that on May 30, 2012, at approximately 7:30 p.m. or 7:45 p.m., she came out onto her patio and saw Mr. McHaddon and another man coming from Mr. McHaddon's house to the garage area. Ms. Page then testified that she saw Mr. McHaddon and this man get into a car. She stated that Mr.

McHaddon was on the driver's side, and the man was on the passenger's side. Ms. Page described the man as having a bald head, or a buzzed or shaved head, with "tattoos all up and down his arms," and across his back.

{¶19} David Funk, Melanie Funk's nephew, testified that he knows Mr. Mount through Ms. Funk because Mr. Mount had been dating Ms. Funk at the time of Mr. McHaddon's death. Mr. Funk stated that in May of 2012, both he and Ms. Funk lived at 447 South Columbine Avenue, and Mr. Mount would stay with them "quite frequently." Mr. Funk described Mr. Mount as having "a-lot" of tattoos, "like a T-shirt * * * tattooed on" his arms, chest and back. On May 31, 2012, at approximately 12:00 a.m., Mr. Funk testified that Mr. Mount pulled in the driveway behind him at 447 South Columbine Avenue driving an "all-white Pontiac G6." Then, the following testimony ensued:

Q. What happened when you guys both pulled in? * * *

A. He had a computer and whatnot in the back of the car, trying to sell it, and I basically refused any of the offers, and that was pretty much it. Then he left.

Q. Let me stop you right there. So you say he was trying to sell you something from inside the car?

A. Yes, a TV.

Q. And you said a computer?

A. Computer and TV, any of it.

Q. Okay. Did you see those items in the car?

A. Yes.

Q. Can you please tell me where they were located in the car when you saw them?

A. Back seat.

Q. The TV, computer?

A. The TV, computer, was on the floorboard, bottom, back behind the seat, on the floor. Other gadgets for a computer. Uhm, a [Sirius] [] radio.

* * *

Q. When you say "gadgets for a computer," what do you mean by that?

A. The surround speakers, mouse, keyboard, stuff like that.

Q. Okay. And that was all in the back seat?

A. Yeah.

* * *

Q. And the computer, talking about is it like a home computer where there is a big box, or is it a laptop?

A. Home computer, like a tower.

* * *

Q. And you're saying that [Mr. Mount] actually came up to you and said, "Do you want to buy this stuff?"

A. I walked up to the car. He never got out. I walked up to the vehicle.

Q. How did that conversation start, about buying this stuff from the car?

A. I walked up and seen all the stuff. He was trying to go get gas to see his son out of state, North Dakota or something along those lines, and he was trying to get [Ms. Funk] to go with him.

Q. He told you he was trying to go to North Dakota?

A. Yeah, he was selling the items to try to get them gas money. He was selling the items.

* * *

Q. So he is there, he talks to you about selling the items in the car. He leaves, you stay at the house?

A. Right. * * *

Q. He comes back to the home in the car again?

A. Right.

Q. Do you see and talk to him then?

A. Yes.

* * *

Q. Do you see the same items in the car, like a TV in the car, at that time?

A. No. The computer and everything was in the trunk at this time.

Q. All right. So you saw inside the trunk?

A. Uh, he opened it, still trying to sell me the computer.

Q. Where is the TV?

A. Whenever he left, that's when it was – whatever he did with it.

Q. So it wasn't in the car when he came back?

A. No.

* * *

Q. When you're sitting in the car with [Mr. Mount] what else did—what else does he say to you?

A. Uh, he mentions credit cards and checkbooks.

* * *

Q. Go ahead, he mentioned—

A. Uhm, credit cards and checkbooks, if I knew anybody that would cash checks so he could get gas money to make it to see his son.

Q. Okay. You said something about a credit card?

A. Credit cards, if anybody would max them out or anything along them [sic] lines.

* * *

Mr. Funk also testified that Mr. Mount and Ms. Funk left the Columbine address together in the car at approximately 2:30 a.m.

{¶20} Nick McCurry testified that he and Mr. McHaddon met on an adult website known as "Adult Friend Finder," and that they had had met in person on two occasions. On both of these occasions, they met at Mr. McHaddon's house and Mr. McHaddon performed oral sex

on Mr. McCurry. On the evening of May 30, 2012, Mr. McCurry testified that he called Mr. McHaddon at around 9:00 p.m. to talk and see if he wanted to get together that evening. Further, Mr. McCurry testified that he spoke to Mr. McHaddon once again at 9:46 p.m., prior to leaving his house in Ashland, Ohio. Mr. McCurry stated that he arrived at Mr. McHaddon's house at approximately 11:00 p.m., but when he called Mr. McHaddon's phone, no one answered. Mr. McCurry then testified that he drove past Mr. McHaddon's house twice that evening before heading back to Ashland, and called several times that night and in the days to follow.[1]

{¶21} Detective Pat McMillan, of the Akron Police Department, testified that on May 31, 2012, he was alerted that Mr. McHaddon's 2008, white Pontiac had been stolen. He and Detective Suggett were asked to travel to the Columbine address to look for the vehicle. Detective McMillan testified that he and Detective Suggett drove separately in unmarked city cars, and as they approached the intersection of Ellet Avenue and Columbine, they spotted the vehicle at a stop sign. Detective McMillan also testified that when Detective Suggett pulled up alongside it, the driver yelled "fuck you," and then "sped off, in a rapid acceleration." Additionally, Detective McMillan indicated that the vehicle was ultimately apprehended at a US Bank on Canton Road. Detective McMillan testified that when he arrived at the bank, the driver "was out of the car, sitting on the curb, handcuffed," and that he had a buzz cut and numerous tattoos on his arms, back, chest, and neck.

{¶22} Officer Stephen Sabol, of the Akron Police Department, testified that on May 31, 2012, a "be on the lookout" call came over his radio for a person in a 2008 Pontiac Grand Prix, four door, white vehicle in connection with a suspicious death. Officer Sabol further testified

---

[1] The telephone records submitted as State's Exhibit 36 corroborate Mr. McCurry's testimony regarding the series of telephone calls made to Mr. McHaddon's phone on May 30, 2012.

that when he learned the vehicle was possibly at the US Bank on Canton Road, he drove to that location and parked his cruiser "nose to nose" with the Grand Prix. He then ordered the driver and passenger to come out of the vehicle with their hands up and, with the assistance of other officers, handcuffed both persons. Officer Sabol described the driver of the vehicle as a white male with no shirt on, "heavily tattooed across the whole front of his chest." Additionally, Officer Sabol testified that, while he later learned Mr. Mount's true identity, the driver of the vehicle gave him a fake name at the time he was being handcuffed and secured. Officer Sabol also identified State's Exhibit 58, a photograph depicting a white, heavily tattooed male, as Mr. Mount on the date of his arrest.

{¶23} Lieutenant Roger Erwin and Detective Michael Shaeffer, of the Akron Police Department, testified that during their processing and examination of the 2008 Pontiac registered to Mr. McHaddon, they found, among other things, a computer, computer monitor, speakers, printer, CB radio, cell phone, several bags of clothing, and Mr. McHaddon's wallet, credit cards and checkbook.

{¶24} Detective Rich Morrison, of the Akron Police Department, testified that on May 31, 2012, he responded to Mr. McHaddon's house due to reports of "a sudden death." Detective Morrison further testified that, while on the scene, he noticed that a TV appeared to be missing from the entertainment center in the living room because the cords were "flopped down," and "some were cut," and a computer appeared to be missing from Mr. McHaddon's bedroom because "[t]he cords were cut, for the most part."

{¶25} Christine Hammett, a forensic scientist at the Ohio Attorney General's Office, testified that, as part of her job, she examines evidence for bodily fluids such as semen, saliva and blood. Ms. Hammett further testified that, in this case, her testing included: (1) oral swabs

from Mr. McHaddon's mouth for semen, (2) penile swabs from Mr. McHaddon for amylase, a component of saliva, and (3) rectal swabs from Mr. McHaddon for semen. Ms. Hammett indicated that she did not identify any semen on the oral or rectal swabs, and did not identify any amylase on the penile swabs.

{¶26} Stacy Violi, a forensic scientist employed at the Ohio Bureau of Criminal Identification & Investigation ("BCI"), testified as an expert witness regarding the DNA analysis performed on several items of evidence, including: (1) item 1.1, swabs of the right side of Leonard McHaddon's face; (2) item 6.1, swabs from the scratch on the left side of Leonard McHaddon's face; (3) item 7.1, swab from front pockets of Leonard McHaddon's shorts; (4) item 7.2, swab from rear pockets of Leonard McHaddon's shorts; (5) item 8.1, swabs from Mr. Mount's right hand and fingernail scrapings; (6) item 8.2, swabs from Mr. Mount's left hand and fingernail scrapings; (7) item 8.3, swab of wooden scraper from Mr. Mount's fingernails; (8) item 9.1, DNA standard from Mr. Mount; (9) item 10.1, DNA standard from Melanie Funk, Mr. Mount's girlfriend; (10) item 11.1, DNA standard from Leonard McHaddon; (11) item 13.1A, swab of webcam found on Leonard McHaddon's bed; (12) item 13.2A, swab of opposite end of webcam; (13) item 13.3A, swab from the middle of webcam; (14) item 14.1A, swab of ends of cut electrical cord found at the top of Leonard McHaddon's basement stairs; (15) item 14.2A, swab from middle of cut electrical cord; (16) item 15.1, swab from mouth of beer can found on Leonard McHaddon's kitchen floor; (17) item 17.1, DNA standard from James McHahan, Leonard McHaddon's roommate; (18) item 18.1A, swab of knife found in driveway of 447 S. Columbine Ave., (19) item 22.1, cutting from stain on cotton pad of band aid found in the trunk of Leonard McHaddon's car; (20) item 22.2, swab of adhesive portion of band aid; (21) item

23.1, swab of ignition key from Leonard McHaddon's car; (22) item 23.2, swab of remote; and (23) item 25.1, swab of Leonard McHaddon's tank top in the shoulder areas.

{¶27} Ms. Violi testified that Mr. Mount *could not be excluded* as a DNA contributor on items 7.1 (front pockets of Leonard McHaddon's shorts), 7.2 (rear pockets of Leonard McHaddon's shorts), 15.1A (the beer can), and 18.1A (the knife). Ms. Violi further testified that, based upon the national database provided by the Federal Bureau of Investigation ("FBI"), the proportion of the population that cannot be excluded as possible contributors to item 7.1, the mixture of DNA taken from the front pockets of Leonard McHaddon's shorts, is 1 in 1,714 unrelated individuals. Additionally, the proportion of the population that cannot be excluded as possible contributors to item 7.2, the mixture of DNA taken from the rear pockets of Leonard McHaddon's shorts, is 1 in 915 unrelated individuals; and from item 18.1A, the mixture of DNA taken from the knife, is 1 in 37,290 unrelated individuals. Further, Ms. Violi testified that with regard to item 15.1A, the beer can, "the expected frequency of occurrence of the major DNA profile from the swab of the mouth of the can, [] is 1 in 12 quintillion, 350 quadrillion unrelated individuals." Ms. Violi explained that this statistical analysis means that "if you would hypothetically test 1,714 unrelated individuals [for item 7.1], one of these individuals has the genetic profile that's capable of fitting into the mixture of DNA profiles [] obtained from the swab from the front pockets of [Leonard McHaddon's] shorts."

{¶28} In Mr. Mount's case-in-chief, he presented the testimony of his mother, Louetta Wonn. Ms. Wonn testified that she and her husband had been close friends with Mr. McHaddon and his deceased wife, Rose, for approximately 20 years. Ms. Wonn further testified that, after Rose passed away, Mr. Mount helped Mr. McHaddon around the house and with car repairs.

Further, Ms. Wonn stated that, in April of 2012, Mr. Mount had been staying at Mr. McHaddon's house for an unknown period of time.

{¶29} Here, the evidence indicates that: (1) Mr. Mount knew Mr. McHaddon and was familiar with his house, car, and belongings; (2) on May 30, 2012, a person fitting Mr. Mount's physical description was seen during the hours of 5:30 p.m. to 9:00 p.m., going back and forth between Mr. McHaddon's house and garage, carrying a beer or pop can; (3) on May 30, 2012, at approximately 7:30 p.m., a neighbor saw a person fitting Mr. Mount's physical description with Mr. McHaddon in a car; (4) Mr. McHaddon was last known to be alive on May 30, 2012, at 9:46 p.m., based upon a telephone conversation with Mr. McCurry; (5) at approximately 8:00 a.m., on May 31, 2012, Todd McHaddon discovered his Father's dead body, and later noticed that his Father's TV, computer, computer related items, cell phone, wallet, checkbook, and white Pontiac Grand Prix were missing from the house and garage; (6) in the early morning hours of May 31, 2012, Mr. Funk saw Mr. Mount driving an "all-white Pontiac G6" when he came to pick up Ms. Funk at the Columbine address; (7) Mr. Mount was trying to sell Mr. Funk a TV and computer, as well as cash checks and max out credit cards, in order to have gas money to drive out to North Dakota to visit his son; (8) when the police spotted Mr. Mount in the white Pontiac Grand Prix, Mr. Mount fled from the scene, (9) when Mr. Mount was finally apprehended and arrested, he gave the police a false name; (10) the police found most of the missing items from Mr. McHaddon's house in the white Pontiac Grand Prix, along with bags of clothing belonging to Mr. Mount and Ms. Funk, (11) Mr. McHaddon's cause of death is asphyxia due to ligature strangulation, and the manner of death is homicide; (12) it takes about five minutes of continuous loss of oxygen to the brain for a person to die from strangulation; (13) Dr. Dean's findings indicate that Mr. McHaddon was killed the evening before his body was found; (14) Mr.

Mount's DNA could not be excluded as a contributor from the front and rear pockets of Mr. McHaddon's shorts, the beer can found in Mr. McHaddon's kitchen, and a knife found at the Columbine Avenue address; and (15) there was no semen identified on the oral or rectal swabs taken of Mr. McHaddon, nor was any amylase identified on the penile swabs.

**{¶30}** Based upon the record before us, we conclude that the evidence is sufficient to support the jury's finding that Mr. Mount murdered Mr. McHaddon purposely, with prior calculation and design, or purposely while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, aggravated robbery. *See* R.C. 2903.01(A)/(B).

**{¶31}** First, a reasonable inference can be drawn from the evidence that if Mr. Mount lived with Mr. McHaddon for any period of time, as testified to by his Mother, Ms. Wonn, Mr. Mount knew Mr. McHaddon and had intimate knowledge of Mr. McHaddon's house, belongings, health problems, and general schedule. Second, eye witness testimony established the fact that Mr. Mount spent several hours with Mr. McHaddon on May 30, 2012, and was seen driving his car and attempting to sell his personal items for the stated purpose of obtaining money to leave the state. Considering the evidence as a whole, the jury could reasonably conclude that he spent time with Mr. McHaddon then chose to murder him at a time when they were alone for the purpose of stealing Mr. McHaddon's car and personal property. Third, as to the element of prior calculation, because strangulation does not typically cause instantaneous death, Mr. Mount had sufficient time and opportunity to contemplate his actions during the course of the murder, and could have chosen to stop the strangulation prior to killing Mr. McHaddon. *See State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, ¶ 56; *see also Patel,* 2008-Ohio-4693, at ¶ 34

**{¶32}** In his merit brief, Mr. Mount argues that there was no evidence presented as to prior calculation and design and therefore the evidence was insufficient to find him guilty of aggravated murder under R.C. 2903.01(A). However, in viewing the evidence in a light most favorable to the prosecution, and even assuming that the evidence was insufficient to find Mr. Mount guilty of aggravated murder pursuant to R.C. 2903.01(A), we conclude that a rational trier of fact could have found that, pursuant to R.C. 2903.01(B), Mr. Mount purposely caused the death of Mr. McHaddon while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, aggravated robbery. Further, a rational trier of fact could have found that Mr. Mount inflicted, or attempted to inflict, serious physical harm on Mr. McHaddon in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, in violation of R.C. 2911.01(A)(3). Therefore, Mr. Mount's convictions for aggravated murder and aggravated robbery are supported by sufficient evidence.

**{¶33}** Accordingly, Mr. Mount's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

[MR.] MOUNT'S CONVICTIONS FOR AGGRAVATED MURDER AND AGGRAVATED ROBBERY WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶34}** In his second assignment of error, Mr. Mount argues that his convictions for aggravated murder and aggravated robbery are against the manifest weight of the evidence. Specifically, Mr. Mount argues that the circumstances of how the body was found, with Mr. McHaddon's pants down around his knees, coupled with death by strangulation, "certainly would indicate the possibility of accidental death during a consensual act of homosexual 'erotic asphyxiation' that went too far." Because Mr. Mount has limited his manifest weight argument

as such, we will limit our discussion accordingly. *See* App.R. 16(A)(7); *see also State v. McDonald*, 9th Dist. Medina No. 12CA0093-M, 2013-Ohio-4972, ¶ 32, citing *Cardone v. Cardone,* 9th Dist. Summit No. 18349, 1998 WL 224934, *8 (May 6, 1998) (stating that it is not the duty of the appellate court to create arguments for the appellant).

{¶35} When a defendant asserts that his conviction is against the manifest weight of the evidence:

> [A]n appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). In making this determination, this Court is mindful that "[e]valuating evidence and assessing credibility are primarily for the trier of fact." *State v. Shue*, 97 Ohio App.3d 459, 466 (9th Dist.1994), citing *Ostendorf-Morris Co. v. Slyman*, 6 Ohio App.3d 46, 47 (8th Dist.1982) and *Crull v. Maple Park Body Shop*, 36 Ohio App.3d 153, 154 (12th Dist.1987).

{¶36} Here, throughout the trial, the jury heard evidence that arguably supported Mr. Mount's alternate theory of Mr. McHaddon's death. Mr. McCurry admitted to having sexual relations with Mr. McHaddon on two prior occasions, and also admitted that, on May 30, 2012, at approximately 10:00 p.m., he traveled from Ashland to Akron with the intention of engaging in the same activity. Lieutenant David Whiddon testified that he interviewed Mr. McCurry twice, first over the telephone and then in person, because Mr. McCurry's statement that he "never made it" to Akron on May 30, 2012, was inconsistent with the data collected from his cell phone records. Dr. Dean opined as to whether Mr. McHaddon's death could have been a result of recreational, violent sex, as follows:

\* \* \*

Q. Now, you're familiar with incidents of recreational sex that can turn violent, are you not?

A. Yes, I am.

Q. In fact, in some cases of recreational violent sex, parties have a written contract on how far they will go; are you familiar with that?

A. I am.

Q. Now, when you testified that the pressure from anywhere from 15 seconds could cause unconsciousness—correct?

A. Correct.

Q. In this case with Mr. McHaddon, because he had breathing difficulties, he had a coronary artery that was 75 percent blocked, that could cause him [to become unconscious] in much less than 15 seconds—could it not?

A. It could.

Q. Yes, okay. And he also could pass away in much less than the five minutes, could he not?

A. He could.

\* \* \*

Q. You can't tell in this case whether or not this would be an intentional or accidental death, can you?

A. *Of course I can. This was intentional.*

Q. If it were recreational or violent sex, you cannot make that determination, can you?

A. *He was left to die.*

Q. That wasn't the question. You cannot tell whether it was \* \* \* recreationally violent sex or some other type of violent strangulation of Mr. McHaddon. You cannot tell that, can you, with a reasonable degree of medical and scientific certainty?

A. Those are two questions. The first question was was this accidental, or was it on purpose. *Even if this would have been violent sex, putting something around someone's neck is intentional. You have to know the risk of death is there.*

Q. Absolutely. But you know from your studies that some men have very erotic experiences by a near strangulation experience, correct?

A. Correct.

* * *

(Emphasis added.) Further, Dr. Dean acknowledged that when she first saw Mr. McHaddon's body, his shirt was pulled up close to his neck, his pants were pulled down, and his underwear were pulled down. Also, in viewing the crime scene photographs, Dr. Dean saw a "damp towel" and handkerchief near Mr. McHaddon's body. The jury also saw, first-hand, the crime scene photographs depicting how Mr. McHaddon was found in his bedroom, and heard testimony that the towel and handkerchief were not tested for DNA.

{¶37} However, the jury also heard testimony that Mr. Mount knew Mr. McHaddon and was familiar with Mr. McHaddon's household, that Mr. Mount needed gas money to travel to North Dakota to visit his son, that neighbors saw a man matching Mr. Mount's description at Mr. McHaddon's house on May 30, 2012, that findings during the autopsy were consistent with the theory that Mr. McHaddon was killed the evening before his body was found, that Mr. Mount was trying to sell Mr. McHaddon's belongings in the early morning hours of May 31, 2012, that Mr. Mount inquired as to how to max out credit cards and cash checks, that Mr. Mount was arrested while driving Mr. McHaddon's car after fleeing from the police[2], that Mr. Mount's DNA could not be excluded from samples taken from the front and rear pockets of Mr. McHaddon's shorts, a beer can found in Mr. McHaddon's kitchen, and a knife found at the Columbine address where Mr. Mount had been staying with Ms. Funk, and that there was *no*

---

[2] "It is an established principle of law that '[f]light from justice * * * may be indicative of a consciousness of guilt." *State v. Nichols,* 9th Dist. Summit No. 24900, 2010-Ohio-5737, ¶ 11, citing *State v. Taylor,* 78 Ohio St.3d 15, 27 (1997).

indication of semen on Mr. McHaddon's anus or mouth, and no indication of amylase on Mr. McHaddon's penis.

{¶38} Based upon the foregoing, we cannot say that Mr. Mount's convictions for aggravated murder and aggravated robbery were against the manifest weight of the evidence. It is well-settled that "[t]he identity of a perpetrator may be established using direct or circumstantial evidence," as both types of evidence are accorded equal probative value. *State v. Liggins,* 9th Dist. Summit No. 24220, 2009-Ohio-1764, ¶ 11, quoting *State v. Flynn,* 9th Dist. Medina No. 06CA0096-M, 2007-Ohio-6210, ¶ 12. *See also State v. Park,* 9th Dist. Lorain No. 09CA009568, 2010-Ohio-3943, ¶ 7-13 (concluding that the appellant's convictions for robbery and theft were not against the manifest weight of the evidence given the circumstantial evidence that he was missing from a party at the time the offense occurred and the conflicting testimony of his whereabouts during that time span). Further, "in reaching its verdict, the jury is free to believe all, part, or none of the testimony of each witness." *Prince v. Jordan*, 9th Dist. Lorain No. 04CA008423, 2004-Ohio-7184, ¶ 35.

{¶39} In the present matter, the jury clearly believed the State's theory of Mr. McHaddon's death: that Mr. Mount purposely, with prior calculation and design, or purposely before, during or immediately after committing aggravated robbery, strangled Mr. McHaddon in order to steal his household belongings and car. As this Court has repeatedly stated, "a conviction is not against the manifest weight because the jury chose to credit the State's version of the events." *State v. Minor*, 9th Dist. Summit No. 26362, 2013-Ohio-558, ¶ 28, quoting *State v. Breneman*, 9th Dist. Wayne No. 11CA0039, 2012-Ohio-3632, ¶ 9. Therefore, after review of the record, we cannot conclude that this is the exceptional case where the jury clearly lost its way and created a manifest miscarriage of justice. *See Otten,* 33 Ohio App.3d at 340.

**{¶40}** Accordingly, Mr. Mount's second assignment of error is overruled.

III.

**{¶41}** In overruling Mr. Mount's two assignments of error, the judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.


CARLA MOORE
FOR THE COURT



BELFANCE, P. J.
HENSAL, J.
CONCUR.

APPEARANCES:

NICHOLAS SWYRYDENKO, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.