[Cite as *State v. Miller*, 2018-Ohio-1172.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

| | |
|---|---|
| STATE OF OHIO | C.A. No.     17CA0053-M |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| JAMES F. MILLER | COURT OF COMMON PLEAS COUNTY OF MEDINA, OHIO |
| Appellant | CASE No.     16CR0632 |

DECISION AND JOURNAL ENTRY

Dated: March 30, 2018

SCHAFER, Presiding Judge.

{¶1} Defendant-Appellant, James Miller, appeals from his convictions in the Medina County Court of Common Pleas. This Court affirms.

I.

{¶2} Miller and his wife routinely hosted her parents at their home each Wednesday evening and ate dinner together. One such evening, Miller was absent because he had expressed his intention to travel to Kentucky on business. When his in-laws returned home, his father-in-law discovered that his personal safe was missing. The safe contained a number of personal documents, collector's items, and a significant amount of cash.

{¶3} Though Miller had said he would return from Kentucky within a day or two, he was gone for almost two months. He and his wife were experiencing serious financial problems at the time, but, while he was away, Miller drove cross-country and paid cash for a variety of items, including a motorcycle. He also spoke with his wife only once when she learned from the

police that he was staying the night at a hotel in Colorado. When Miller finally returned, the police immediately arrested him, having received a tip about his return. A search of his person uncovered a handgun as well as at least one collector's item from his father-in-law's safe.

{¶4} A grand jury indicted Miller on one count of burglary, theft from an elderly person, safecracking, and having a weapon under disability. Another count of theft from an elderly person was later added by way of supplemental indictment. The matter proceeded to jury trial, at the conclusion of which the jury found Miller guilty of burglary, safecracking, having a weapon under disability, and one count of theft from an elderly person. The court sentenced him to a total of seven years in prison, and Miller appealed from his convictions.

{¶5} This Court dismissed Miller's first appeal because the record did not contain a resolution of his additional count for theft from an elderly person. *See State v. Miller*, 9th Dist. Medina No. 17CA0041-M (July 17, 2017). In response to this Court's dismissal, the trial court issued a nunc pro tunc entry. The court clarified that only four counts were submitted to the jury because, before trial, the State had requested the dismissal of the original theft count. Miller then appealed from the court's nunc pro tunc entry.

{¶6} Miller's appeal is now before this Court and raises three assignments of error for our review.

II.

{¶7} Initially, we address the State's contention that Miller's appeal is untimely. The State argues that the appeal is untimely because a nunc pro tunc entry does not extend the period within which an appeal must be filed. *See, e.g., State v. Senz*, 9th Dist. Wayne No. 02CA0016, 2002-Ohio-6464, ¶ 19. While that is generally true, "[e]xceptions exist in situations where [a] nunc pro tunc entry creates additional rights * * *." *Id.* Before the trial court issued its nunc pro

tunc entry, a final, appealable order did not exist in this case. *See State v. Miller*, 9th Dist. Medina No. 17CA0041-M (July 17, 2017). That is because the trial court had never previously journalized the dismissal of Miller's original theft count and that count remained pending. *See State v. Overstreet*, 9th Dist. Summit No. 21367, 2003-Ohio-4530, ¶ 8 (courts speak only through their journal entries, not oral pronouncements). Once the court resolved that count by journalizing its dismissal, Miller filed his notice of appeal within thirty days of its decision. *See* App.R. 4. Accordingly, we conclude that his appeal is properly before us.

### Assignment of Error I

**The trial court erred by permitting the defendant's wife to testify to marital communications between husband and wife and actions taken by her husband that were highly inflammatory, prejudicial and violated defendant's right to a fair trial.**

{¶8} In his first assignment of error, Miller argues that he was denied a fair trial because the trial court admitted the testimony of his wife in violation of the spousal privilege statute. We do not agree that Miller was denied a fair trial.

{¶9} "Generally, this Court reviews a trial court's ruling on the admissibility of evidence for an abuse of discretion." *State v. Truitt*, 9th Dist. Summit No. 25527, 2011-Ohio-6599, ¶ 24. The applicability of a privilege, however, is a question of law that this Court reviews de novo. *See McFarland v. West Congregation of Jehovah's Witnesses*, 9th Dist. Lorain No. 15CA010740, 2016-Ohio-5462, ¶ 65. "A de novo review requires an independent review of the trial court's decision without any deference to [its] determination." *State v. Consilio*, 9th Dist. Summit No. 22761, 2006-Ohio-649, ¶ 4.

{¶10} "R.C. 2945.42 governs the availability and extent of the spousal privilege in criminal cases." *State v. Gordon*, 9th Dist. Summit No. 28191, 2017-Ohio-5796, ¶ 37. The statute provides, in pertinent part, that a person shall not testify against his or her spouse

"concerning a communication made by one to the other, or act done by either in the presence of the other, during coverture, unless the communication was made or act done in the known presence or hearing of a third person competent to be a witness * * *." R.C. 2945.42. The "privilege belongs to the nontestifying spouse." *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, ¶ 112. Accordingly, it "'allows a defendant to prevent his or her spouse from testifying [as to a privileged communication] unless one of the statute's exceptions applies.'" (Alteration sic.) *Id.*, quoting *State v. Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, ¶ 55, fn. 3.

{¶11} Miller's wife elected to testify against him at trial. In essence, she provided testimony on three topics: (1) the events leading up to and following the disappearance of her father's safe; (2) background information about the safe and the businesses, accounts, and vehicles she and Miller owned; and (3) her observations regarding Miller's behavior and the conclusions she drew from them. Miller argues that her testimony on the final topic violated his spousal privilege. According to Miller, her testimony was highly damaging to his defense because it provided a motive in an otherwise circumstantial case.

{¶12} Miller's wife testified that her parents met her for dinner one Wednesday evening, as was their weekly custom. Miller was absent that particular evening because he was supposed to be in Kentucky, retrieving motorcycle parts from their trailer. The wife testified that the two had rented a large Penske truck the previous day for this specific purpose. She indicated that her parents left around 11:00 p.m. the evening of the burglary, and she went to bed. She was later awoken by a phone call and learned that her father's safe had been stolen.

{¶13} The wife testified that her father had kept a personal safe for a very long time, stored a lot of money in it, and frequently loaned money to her and Miller at Miller's request. Whenever her father did so, he would walk to his back bedroom and retrieve the money while

she and Miller waited in his living room. About a month before his safe was stolen, however, her father had told them there would be no more loans because he needed the money to pay for his ailing wife's care.

{¶14} Miller's wife testified that he was supposed to be gone for one to two days when he left for Kentucky, but that he was ultimately gone for almost two months. During that time, she and her son filed a missing person's report, and she only spoke with Miller once on the phone. The wife testified that her adult son was present during the phone conversation and that Miller was aware her son was listening because she had placed the call on speakerphone. During the call, she tried to convince Miller to return home, turn himself in, and apologize to her father. Miller, however, adamantly refused and stated that "he knew that people were after him and he would probably get shot."

{¶15} The wife described Miller as acting increasingly paranoid and anxious leading up to the night of the burglary. She stated that, at that time, they were in danger of "losing everything" because they owed significant sums to the IRS and their home was in foreclosure. The wife testified that she first had difficulty believing Miller had stolen her father's safe, but changed her mind when he disappeared for almost two months. During that time, she was able to track his movements on several occasions by monitoring their debit card and PayPal account for attempted usage. She testified that she assumed Miller funded his trip with her father's money because they were otherwise broke.

{¶16} The wife acknowledged that Miller had a drug problem and, specifically, was addicted to pain killers. She stated that he would experience withdrawals if he ran out of pills and "would call around and find somebody who had something." She testified that Miller would take money from their accounts and, in the end, "was selling stuff out of the house to buy drugs."

According to the wife, Miller's drug problem was getting "way worse" leading up to the burglary.

{¶17} This Court will assume for purposes of its analysis that certain portions of the wife's testimony were privileged, and thus, improperly admitted. *See* R.C. 2945.42. Even so, we must conclude that the admission of that testimony was harmless beyond a reasonable doubt. *See State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, ¶ 177. That is because the record contains "'overwhelming evidence of [Miller's] guilt.'" *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, ¶ 29, quoting *State v. Rahman*, 23 Ohio St.3d 146, 151 (1986).

{¶18} Miller's father-in-law testified that he had between $75,000 and $80,000 in his safe when it was stolen. The majority of that money consisted of $100 bills, but he also stored several collector's items in the safe. Of particular note, he kept stored a collectible $50 bill from 1934 and a gold church medallion that his wife received in the 1950s when she took a high school class trip to Washington, D.C. There was testimony that, at the time of his arrest, Miller had on his person a $50 bill from 1934 and a gold medallion. Miller's father-in-law identified the medallion in court, indicating that he had "no doubt" it was the one that belonged to his wife.

{¶19} Miller's father-in-law testified that he never locked the side door leading into his garage, but did lock the man door leading into the house and his safe. He had separate keys for each. The key to the man door he hid in the garage, and the key to the safe he hid in his bedroom. When he and his wife returned from their daughter's house on the evening of the burglary, the house was locked and the safe key was still hidden, but the safe and the key to the man door were gone. There was evidence that the house had otherwise been left untouched, such that nothing had been broken or rifled through. There also was evidence that the location of the

man door key was a matter of common knowledge among immediate family members, but the location of the safe key was not.

{¶20} There was testimony that Miller owned a cream-colored, 1989 Dodge van that was in poor condition and was not his primary vehicle. One of the in-laws' neighbors testified that he went outside on the evening of the burglary and saw an older, Dodge-model, white van parked in the in-laws' driveway. The police also were able to capture surveillance video from a nearby traffic camera that depicted a similar van heading in the direction of the burglary that evening and leaving the area a short while later. The police were able to confirm that certain distinctive marks on Miller's van matched the marks they saw on the van in the surveillance video. Moreover, Miller later stipulated that he was driving his van that evening and pulled into his father-in-law's driveway for a short while.

{¶21} An acquaintance of Miller's testified that he saw Miller at about 10:00 p.m. on the evening of the burglary. The acquaintance sometimes went with Miller on swap meets, accompanied him on out-of-town trips, and performed various tasks for him in exchange for cash. Further, he stated that he had dealings with Miller due to "helping each other out with pills and so forth * * *." The acquaintance confirmed that he was a former addict and stated that Miller would use a code word when they needed to talk about drugs.

{¶22} The acquaintance testified that Miller came over that evening to pay him for earlier work and pills. He testified that Miller was driving a Penske van when he arrived and was in a rush. According to the acquaintance, Miller specifically stated that he had to hurry because his "wife [thought he was] already down in Kentucky." The acquaintance confirmed that Miller paid him in cash before leaving.

{¶23} Miller's adult son testified that it was a matter of common knowledge in their family that his grandfather had more than $70,000 in cash in his safe. He stated that, near the time of the burglary, he knew his parents' finances were grim. A few weeks before the burglary, a signed guitar that the family had kept as a collector's item had disappeared. The son expressed his belief that the guitar was sold or pawned for money to support his father's drug habit. He indicated that he thought Miller was abusing drugs at the time because he was acting differently, experiencing "different mood swings and energy and just different signs of being on drugs * * *." Though the son generally talked to Miller every day, he only talked to him twice in the two-month span after the burglary. He confirmed that he filed a missing person's report after Miller failed to return from Kentucky and would not answer his phone. The son testified that, at various points, he was able to track Miller to parts of Missouri, Colorado, and Nevada due to his attempts to use a debit card.

{¶24} Detective Christopher Scafidi testified regarding his various efforts to investigate the burglary and theft of the safe. He indicated that the police found Miller's Dodge van parked at his motorcycle shop, but were able to confirm via a traffic camera that it had been in the area of the in-laws' house on the night of the burglary. He stated that a warrant for Miller's arrest was issued a week after the burglary, but that Miller was not arrested until he returned home several weeks later. The police inventoried Miller's possessions when he was arrested and found: (1) a receipt for a $1,277.44 cash payment at a Las Vegas hotel; (2) receipts for two different stores in Ohio and Kentucky, indicating that $200 in cash had been tendered at each store; (3) a receipt for a Harley-Davidson store in Kentucky, indicating that $800 in cash had been tendered; and (4) a bill of sale for a Harley-Davidson motorcycle, indicating that Miller had paid $16,000 for the bike three days after the burglary. Detective Scafidi confirmed that the

motorcycle was the same one Miller drove home when he was arrested. He testified that the missing safe was never recovered, but that the police did find on Miller a gold medallion that the father-in-law "immediately recognized" as having come from the safe.

{¶25} Because the State set forth overwhelming evidence of Miller's guilt, this Court must conclude that the court's error in the admission of Wife's testimony, if any, was harmless beyond a reasonable doubt. *See Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, at ¶ 29, quoting *Rahman*, 23 Ohio St.3d at 151. Apart from the wife's testimony, there was evidence that Miller had a drug habit and was acting differently around the time of the burglary. There was evidence that his financial status was grim, but that he managed to acquire $16,000 in cash within a few days of the burglary and likewise continued to pay cash for items while spending almost two months on the road. There was evidence that he had little contact with his family during that time, despite their repeated efforts to contact him. There also was evidence that whoever took the father-in-law's safe knew where his house key was located, relocked the door upon leaving, and did not disturb any other items in the house apart from the safe. The State, therefore, presented evidence from which one could reasonably conclude that the person who stole the safe had an intimate knowledge of the location of both items within the home. Finally, there was evidence that the father-in-law was able to identify the gold medallion Miller was carrying at the time of his arrest as the one he kept in his safe. Having reviewed the record, we cannot conclude that the admission of the wife's testimony deprived Miller of a fair trial. *See Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, at ¶ 177. As such, his first assignment of error is overruled.

## Assignment of Error II

**James Miller Sr. received ineffective assistance of counsel in violation of his Sixth and Fourteenth Amendment rights when his trial counsel failed to object to testimony lacking in foundation and several hearsay statements**

**which, taken together, deprived Mr. Miller of a fair trial.  Counsel's failure to object amounted to plain error.**

{¶26} In his second assignment of error, Miller argues that ineffective assistance of counsel deprived him of a fair trial.  Specifically, he argues that he was prejudiced when his attorney failed to object to the admission of certain testimony.  We disagree.

{¶27} "The Sixth Amendment guarantees a criminal defendant the right to the effective assistance of counsel."  *State v. Liu*, 9th Dist. Summit No. 24112, 2008-Ohio-6793, ¶ 22.  To prevail on a claim of ineffective assistance of counsel, Miller "must establish (1) that his counsel's performance was deficient to the extent that 'counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment' and (2) that but for his counsel's deficient performance the result of the trial would have been different."  *State v. Velez*, 9th Dist. Lorain No. 13CA010518, 2015-Ohio-642, ¶ 18, quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To demonstrate prejudice, an appellant "must prove that there exists a reasonable probability that, were it not for counsel's [deficient performance], the result of the trial would have been different."  *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph three of the syllabus.  This Court need not address both *Strickland* prongs if an appellant fails to prove either prong.  *State v. Ray*, 9th Dist. Summit No. 22459, 2005-Ohio-4941, ¶ 10.

Miller's Son

{¶28} Miller's son was permitted to testify that he believed Miller was using drugs and had sold certain household items, including a signed guitar, to feed his habit.  Miller argues that his son's testimony was speculative, rested upon hearsay, and lacked any foundation.  He avers that his son had no basis to provide lay opinion testimony as to whether or not he was using drugs.  He further avers that his son had no first-hand knowledge that he had sold any household

items. According to Miller, his attorney's failure to object to the foregoing testimony deprived him of a fair trial because the testimony allowed the jury to infer a motive on his part.

{¶29} Miller has failed to demonstrate that, but for his son's testimony, the result of his trial would have been different. *See Bradley* at paragraph three of the syllabus. More than one witness, including Miller's business acquaintance, offered testimony tending to show that Miller was abusing drugs near the time of the burglary. Moreover, there was evidence apart from the son's testimony that Miller and his wife were experiencing financial difficulties around the same time. Though portions of the son's testimony helped establish a motive, "'[p]roof of motive does not establish guilt, nor want of proof of motive establish innocence. If the guilt of the accused be shown beyond a reasonable doubt, it is immaterial what the motive for the crime, or whether any motive be shown.'" *State v. Mount*, 9th Dist. Summit No. 26941, 2014-Ohio-5334, ¶ 12, quoting *Fabian v. State*, 97 Ohio St. 184, 189 (1918). As previously noted, the State set forth an overwhelming amount of circumstantial evidence to establish Miller's guilt, including that he was apprehended while in possession of a unique item from the missing safe (i.e., a gold medallion). Because Miller has not shown that the admission of his son's testimony affected the result in this matter, we reject that portion of his ineffective assistance argument. *See Bradley* at paragraph three of the syllabus.

Miller's Wife

{¶30} This Court previously outlined the testimony of Miller's wife in addressing his first assignment of error. Miller argues that his counsel ought to have objected when his wife testified regarding her assumption that Miller funded his cross-country trip with the money from her father's safe. He avers that her testimony was based on pure speculation. Further, he argues

that he was prejudiced when his wife was permitted to testify, "*over counsel's objection*, about his ongoing drug addiction problem." (Emphasis added.)

**{¶31}** As to the latter argument, it is unclear to this Court why Miller believes his attorney was ineffective, given his acknowledgment that his attorney objected to the testimony. If Miller believes his attorney had a duty to do more than simply object, he has not fleshed out that argument. *See* App.R. 16(A)(7). This Court has repeatedly noted that it is not our duty to fashion arguments on an appellant's behalf. *See Cardone v. Cardone*, 9th Dist. Summit Nos. 18349, 18673, 1998 Ohio App. LEXIS 2028, *22 (May 6, 1998). Accordingly, we reject Miller's ineffective assistance argument to the extent that it concerns his Wife's testimony about his ongoing drug addiction problem.

**{¶32}** Even assuming that Miller's attorney should have objected when the wife offered her opinion about the source of the cash Miller spent while away, Miller has not demonstrated prejudice as a result of her testimony. *See Bradley*, 42 Ohio St.3d 136 at paragraph three of the syllabus. This Court once again notes the overwhelming amount of circumstantial evidence that the State set forth to establish Miller's guilt, including that he was apprehended while in possession of a unique item from the missing safe (i.e., a gold medallion). Miller has not shown that, but for the foregoing testimony, he would not have been convicted. *See id.* As such, we reject his argument.

Detective Scafidi

**{¶33}** Detective Scafidi testified about certain statements that Miller's wife made to him during the course of his investigation. Those statements concerned her initial disbelief and eventual resignation that Miller had perpetrated the crime against her father and her acknowledgment that Miller was addicted to pain pills. Apart from the foregoing testimony, the

detective also gave testimony about the make and model of Miller's van and the fact that it was seen in the area of the burglary on the night in question.

{¶34} Miller argues that portions of the detective's testimony were based on hearsay because they stemmed from statements that his wife had made. He further argues that his counsel ought to have objected to the detective's testimony about the van spotted on a traffic camera video because the State never produced the actual video or laid a foundation for the admission of the detective's testimony. Miller argues that the admission of the detective's testimony about the video prejudiced him because it forced him to stipulate to his presence in the area that evening and to testify in order to explain his presence.

{¶35} This Court has already determined that the admission of the wife's statements did not prejudice the outcome in this matter. Miller has not explained how Detective Scafidi's limited reference to her statements heightened their prejudicial nature. *See* App.R. 16(A)(7). Accordingly, we likewise conclude that any limited reference the detective made to those statements while explaining his investigation did not affect the outcome of the trial. *See Bradley*, 42 Ohio St.3d 136 at paragraph three of the syllabus.

{¶36} Rather than introduce the traffic camera video that captured Miller's van in the area of the burglary, the State introduced through Detective Scafidi several time-stamped, still shots taken from the video. Even assuming that defense counsel should have objected, the record does not support Miller's contention that his failure to do so affected the outcome of the trial. First, the video only showed the van in an area nearby the in-laws' residence, not on their street or in their driveway. Second, it was a matter of State record that Miller and his wife had registered to them a 1989 cream-colored, Dodge van, so that fact did not depend upon the wife's statement. Third, a neighbor of the in-laws saw a white Dodge van in the in-laws' driveway on

the evening in question. Though the neighbor could not identify the driver, he was able to observe a man climb into the driver's seat in a peculiar fashion. He specified that the man "pulled himself in to the van like he was going to get in the back and then he turned and sat down * * *." Miller's brother-in-law testified that Miller had a peculiar way of climbing into cars, "putting his head in the car first and at the last second * * * flip[ping] his butt down." Accordingly, apart from the traffic camera video, there was evidence tending to show that Miller was present that evening. Indeed, that evidence tended to show that he was present in his in-laws' driveway rather than just in the general area. Finally, there was a wealth of other evidence tending to show that Miller suddenly came into a large sum of cash at the same time the safe disappeared and that, when he was arrested some two months later, he had in his possession a unique item from the missing safe (i.e., a gold medallion). Because Miller has not shown that the admission of Detective Scafidi's testimony affected the outcome of this matter, we reject his argument to the contrary. *See id.*

Sergeant Michael Matheis

{¶37} Miller argues that Sergeant Michael Matheis testified to "several hearsay statements made by witnesses in the investigation * * *." In his brief, however, he has only identified one particular set of statements: those of his son. Because his brief does not contain citations to the record or otherwise specifically identify any of the other statements with which he takes issue, we confine our analysis to the statements of his son. *See* App.R. 16(A)(7); *Cardone*, 1998 Ohio App. LEXIS 2028, at *22.

{¶38} Sergeant Matheis testified that he spoke with Miller's son during the course of the investigation. He stated that Miller's son expressed his concerns about Miller's behavior, indicating that he was acting differently, and confessed that he suspected his dad of abusing

drugs. As noted, Miller's son testified at trial and made all of the foregoing statements on the stand. This Court has already concluded that their admission did not affect the outcome of the trial, and Miller has not explained how the sergeant's limited reference to those statements heightened their prejudicial nature. *See* App.R. 16(A)(7). Upon review, we likewise conclude that any limited reference the sergeant made to those statements while explaining his investigation did not affect the outcome of the trial. *See Bradley*, 42 Ohio St.3d 136 at paragraph three of the syllabus. As such, we reject Miller's ineffective assistance of counsel argument. His second assignment of error is overruled.

### Assignment of Error III

**The trial court abused its discretion in permitting a flight instruction when it violated its own rule requiring such instruction be provided seven days in advance of trial.**

{¶39} In his third assignment of error, Miller argues that the trial court abused its discretion when it issued the jury a flight instruction. He argues that the court ought to have rejected as untimely the State's request for the instruction.

{¶40} "Requested jury instructions should ordinarily be given if they are correct statements of law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction." *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, ¶ 240. "This Court reviews a trial court's decision to give or decline to give a particular jury instruction for an abuse of discretion under the facts and circumstances of the case." *State v. Sanders*, 9th Dist. Summit No. 24654, 2009-Ohio-5537, ¶ 45. An abuse of discretion indicates that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶41} Crim.R. 30 provides, in relevant part, that "[a]t the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests." Miller argues that, in a pretrial order, the court ordered the parties to submit proposed jury instructions in advance of trial. The State, however, waited until the end of its case-in-chief to request a flight instruction. Miller objected to the instruction on the basis of its untimeliness, and the State responded that it had not appreciated the instruction would be proper until Miller took the stand and testified in his own defense. The court acknowledged that jury instructions were due the week before trial, but ultimately agreed to give the flight instruction based on the State's explanation.

{¶42} Miller does not take issue with the contents of the flight instruction or its propriety in light of the evidence introduced at trial. His argument is strictly that the court should have denied the State's request for the instruction because it was untimely. Even if the court should have denied the State's request, however, Miller has not shown that the instruction prejudiced his substantial rights. *See* Crim.R. 52(A).

{¶43} The jury heard overwhelming evidence in support of Miller's guilt. Meanwhile, when Miller took the stand in his own defense, his only explanation for his extended absence was that strange people were chasing him across the country. Miller elaborated that a group of over 100 people surrounded him after he left Kentucky. According to Miller, they followed him closely, clogged exit ramps when he attempted to leave various highways, and convinced gas station clerks, restaurant employees, and hotel employees not to sell him gas, or food, or rent him rooms. He described how people followed him to Missouri, Colorado, Nevada, and the West Coast, at one point drilling holes into the walls of his hotel room to insert cameras. Miller

insisted that he funded his trip with cash he received from selling motorcycle parts and from $8,000 in cash he happened to win when he stopped at a casino out west. As to the gold medallion he had in his possession, Miller stated that he collected coins and had many like it.

{¶44} Having reviewed the entire record, this Court cannot conclude that the court's flight instruction prejudiced Miller's substantial rights. *See id.* The State produced overwhelming evidence of his guilt, and he has not shown that the outcome of his trial would have been different but for the instruction. Accordingly, Miller's third assignment of error is overruled.

## III.

{¶45} Miller's assignments of error are overruled. The judgment of the Medina County Court of Common Pleas is affirmed.

Judgment affirmed.

————

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JULIE A. SCHAFER
FOR THE COURT

HENSAL, J.
CALLAHAN, J.
CONCUR.

APPEARANCES:

DAVID C. SHELDON, Attorney at Law, for Appellant.

S. FORREST THOMPSON, Prosecuting Attorney, and VINCENT V. VIGLUICCI, Assistant Prosecuting Attorney, for Appellee.